UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:18-CV-58-TBR

ALICE PENMAN,                                                          PLAINTIFF

v.

CORRECT CARE SOLUTIONS, et al.,                                        DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a Motion to Dismiss filed by Defendants Randy White, Cookie Crews, and Deborah Coleman. (R. 44). Plaintiff Ms. Alice Penman has responded (R. 48), and this matter is now ripe for adjudication. For the reasons that follow, the Court DENIES IN PART AND GRANTS IN PART the Defendants' motion to dismiss. (R. 44).

BACKGROUND

The following facts are taken from Plaintiff Alice Penman's Complaint and accepted as true for the purposes of considering the Defendants' Motion to Dismiss.

A. Inmate Penman's Death

Marcus Penman was an inmate at Kentucky State Penitentiary (KSP) where he was housed in the Seven Cell House Restrictive Housing Unit, Observation Cell #2. At around 1:50 PM on April 25, 2017, Unit Administrator Josh Patton observed Mr. Penman repeatedly beating on his cell door and running into it with his head and body. Ten minutes later, Lieutenant Kerwyn Walston notified Day Shift Commander Captain Garyth Thompson of Mr. Penman's behavior. At this point no medical or mental health personnel had been notified. Captain Thompson authorized a "Cell Entry Team" to enter Mr. Penman's cell, restrain him, and then place him in the restraint

chair. Around 2:05 PM, before the Cell Entry Team assembled at Mr. Penman's cell, Patton retrieved a video camera from the control center, and Officer Robert Harris started recording Mr. Penman. Mr. Penman continued to beat his head against his cell door, causing himself to bleed. He also began punching himself in the face.

Around 2:12 PM, the Cell Entry Team assembled outside Mr. Penman's cell. The Entry Team included: Lieutenant Walston, Officer Michael Lamb, Officer Steven H. Sargent, Officer James Corley, Officer Jose Bailey, Officer Jason Denny, Steve E. Sargent, and Officer Robert Harris—still equipped with the camera. All the officers were wearing full riot gear. Before entering the cell, Lieutenant Walston opened the cell's tray slot and observed Mr. Penman still throwing his head and body against the cell door. Walston began spraying Mr. Penman in the face with pepper spray through the tray slot. He sprayed Mr. Penman at least three separate times. Walston also shot Mr. Penman with a taser gun, lodging a dart in his skin through which Walston electrocuted Mr. Penman. He held the trigger, thereby electrocuting Mr. Penman, for at least seven seconds. Walston continued to intermittently electrocute Mr. Penman through the dart lodged in his skin. Walston then removed the first dart pack from the taser gun, reloaded it, and shot Mr. Penman again. This time Walston electrocuted Mr. Penman for upwards of 18-20 seconds at a time.

At around 2:17 PM, the Cell Entry Team entered Mr. Penman's cell. Upon entering the cell, Officer Steven H. Sargent proceeded to electrocute Mr. Penman with an electrified riot shield. Officer Sargent and Officer Denny then shackled Mr. Penman's legs. After restraining Mr. Penman's legs, Walston electrocuted Mr. Penman with his handheld taser. Officer Lamb then shackled Mr. Penman's hands while Officer Corley secured his head. After he was completely restrained, Walston again began to electrocute Mr. Penman with the taser.

2

From his cell, Mr. Penman was placed in a restraint chair. After he had been placed in the restraint chair, Walston continued to electrocute Mr. Penman with the handheld taser. Walston then placed a hood over Mr. Penman's head and face. Once Mr. Penman had been hooded, Officer Corely, upon instruction from Walston, cut off Mr. Penman's pants with a seatbelt cutter.

At this point, Nurse Bruce Bauer of Correct Care Solutions, LLC had arrived on scene. Officer Patton handed Bauer a pitcher of water that Bauer poured over Mr. Penman's hooded head. Around five minutes later, the officers unhood Mr. Penman to find him unconscious. He remained unconscious and was pronounced dead at the scene.

B. The Kentucky Department of Corrections Subsequent Investigation

After Mr. Penman's death, Kentucky Department of Corrections began a "Critical Incident Review." It has been over a year since that investigation began. It remains open. However, on the day of Mr. Penman's death, KSP officials falsely stated to members of the Kentucky media and Penman's family that all evidence pointed to Mr. Penman's death being the result of self-inflicted injuries. No one has been criminally charged, and only nurse Bauer, a Correct Care Solutions employee, has been fired in connection with the incident.

C. Kentucky State Penitentiary's Systemic Failures

Plaintiff Alice Penman, the administrator of Marcus Penman's estate, alleges in her Complaint that "[f]or years, the KSP has operated under a culture of indifference to inmates' safety and mental health needs," and that "Mr. Penman's suffering and death occurred as a result of systemic failures at KSP." She alleges that "[i]naddequate and unconstitutional mental health policies, practices, training, and supervision were at the heart of [Mr. Penman's death]." To support these claims, Ms. Penman cites the recent death of two other KSP inmates with mental health and medical conditions—Clifford Warfield and James Embry.

While incarcerated at KSP, Clifford Warfield, who had a history of bowel obstructions, stopped eating and drinking. He was deemed by a KSP physician to be malingering, determined to be on "hunger strike," and placed in disciplinary segregation. Warfield starved for five days, until eventually he turned gangrenous and became terminal. Warfield, in fact, had a bowel obstruction. In 2011, high-ranking Kentucky Department of Corrections officials were made aware of Warfield's case.

More recently, in January of 2014, James Embry—another KSP inmate—starved to death over 45 days. According to the Ms. Penman, KSP medical and mental health staff "flatly refused to provide Mr. Embry with medically necessary mental health medication and treatment, despite his pleas for help and blatant need." Embry's untreated mental health disorder caused Embry to lose his appetite. At the time of his death Embry had missed 35 of his last 36 meals. KSP staff did nothing as Embry starved to death.

Just as they did after Mr. Penman's death, The Kentucky Department of Corrections began a Critical Incident Review after Embry starved to death. At its conclusion, it was determined that "the death of inmate James Embry occurred as the result of a systemic failure at the [KSP] . . ."

D. Claims Against Defendants Randy White, Cookie Crews, and Deborah Coleman

Ms. Penman's Complaint identifies Randy White as being KSP's Warden currently and at all times pertinent to this litigation. According to Penman's Complaint White is "responsible for ensuring the safety and well-being of inmates detained and housed at KSP, including the provision of appropriate medical and mental health care and treatment to inmates in need of such care." Warden White is also "responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of KSP, including the policies, practices, procedures, and/or customs that violated Mr. Penman's rights."

According to Penman's Complaint, Cookie Crews is, and at all times pertinent to this litigation was, the Health Services Administrator of the Kentucky Department of Corrections. Penman's Complaint describes her as being responsible "for all operations of institutions within the Kentucky Department of Corrections; the promulgation, implementation and enforcement of all of the Kentucky Department of Corrections's policies, procedures, protocols, customs, and practices; and the employment, training and supervision of employees of the Kentucky Department of Corrections; that concern the health services that are available to the Kentucky Department of Corrections inmates."

Ms. Penman's Complaint names Deborah Coleman as the Mental Health Director of the Kentucky Department of Corrections now and at all times pertinent to this litigation. In her Complaint Penman contends that Coleman is responsible for "all operations of institutions within the Kentucky Department of Corrections; the promulgation, implementation and enforcement of all of the Kentucky Department of Corrections's policies, procedures, protocols, customs, and practices; and the employment, training and supervision of employees of the Kentucky Department of Corrections; that concern inmates' mental health."

Ms. Penman makes allegations against Defendants Cookie Crews, Randy White, and Deborah Coleman based on three forms of liability—supervisory liability under 42 U.S.C. § 1983, negligence, and intentional infliction of emotional distress or outrage.

1. Supervisory Liability (42 U.S.C. § 1983)

In her supervisory liability claim, Ms. Penman alleges that "the underlying violations of Mr. Penman's constitutional rights were in furtherance of and consistent with policies and customs which Defendants White, [] Coleman, [and] Crews promulgated, created, implemented, or possessed responsibility for the continued operation of." Ms. Penman further alleges that White,

5

Coleman, and Crews were aware that KSP's system of caring for mentally ill inmates was replete with systemic failures that made Mr. Penman's death eminently foreseeable. Yet, the Defendants remained deliberately indifferent to the dangers presented by the situation and failed to alleviat the obvious risks. Ms. Penman's Complaint specifically identifies a variety of systemic deficiencies that would fall under the Defendants' purview based on the Complaint's description of the Defendants' professional responsibilities. In addition to the systemic failures, Ms. Penman's Complaint alleges that Mr. Penman's death was caused by the Defendants' failure to employ, train, and supervise qualified individuals for positions of responsibility, as well as their failure to terminate individuals who demonstrated that they were lacking qualifications.

   2. Negligence

In her Negligence claim, Ms. Penman alleges that, based on the events described by the Complaint, "all Defendants [presumably including White, Coleman, and Crews] were negligent and grossly negligent in their treatment of Mr. Penman." Plaintiff Penman also asserts that "the medical professionals responsible for Mr. Embry's care failed to meet the standard of care applicable to their professions in their treatment of Mr. Embry." Because the Plaintiff has no standing to bring a negligence claim on behalf of Mr. Embry, the Court assumes that the Ms. Penman's counsel has made a typographical error, and in the foregoing sentence the name Embry should, in fact, be Penman.

   3. Intentional Infliction of Emotional Distress/Outrage

In her emotional distress claim, Plaintiff Penman alleges that "Defendants' treatment of Penman was so beyond the bounds of human decency that it exemplifies the tort of outrage. As a direct and proximate result of this conduct, Mr. Penman suffered the damages and injuries alleged herein."

STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a plaintiff's complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." "Rule 12(b)(6) provides that a complaint may be dismissed for failure to state a claim upon which relief can be granted." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998). Importantly, "[w]hen considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court must accept all of the allegations in the complaint as true, and construe the complaint liberally in favor of the plaintiff." *Lawrence v. Chancery Court of Tennessee*, 188 F.3d 687, 691 (6th Cir. 1999). Thus, "unless it can be established beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," the motion should be denied. *Achterhof v. Selvaggio*, 886 F.2d 826, 831 (6th Cir. 1989). "However, the Court need not accept as true legal conclusions or unwarranted factual inferences." *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir. 2002). A "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Andrews v. Ohio*, 104 F.3d 803, 806 (6th Cir. 1997).

Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This means that the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* The concept of "plausibility" denotes that a complaint should contain sufficient facts "to state a claim to relief that is plausible on its face." *Id.* at 570. The element of

plausibility is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). But where the court is unable to "infer more than the mere possibility of misconduct, the complaint has alleged—but has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 (internal quotation marks omitted).

DISCUSSION

Defendants' Motion to Dismiss presents two issues: First, whether Ms. Penman has made sufficient factual allegations to support her claims against Defendants White, Coleman, and Crews. Second, whether Defendants White, Coleman, and Crews are entitled to qualified immunity. Defendants argue that "Plaintiff makes no allegations of personal involvement or omissions by [White, Coleman, and Crews] in the events giving rise to this action." (Defs.'s Mot. to Dismiss, p. 6). Rather, "Plaintiff makes bare conclusions," and "recites labels for causes of actions but provides no factual support for the argument." *Id.* Additionally, Defendants argue that because Ms. Penman has alleged no conduct, let alone unlawful conduct, on behalf of the Defendants, they are entitled to qualified immunity. *Id.* at pp. 7-9. Conversely, Ms. Penman argues that her Complaint's factual allegations sufficiently support her claims. (Pl.'s Resp., P. 4). She also argues that the Defendants are not entitled to qualified immunity because, viewing the facts in the light most favorable to the her, White, Coleman, and Crews violated Mr. Penman's clearly established constitutional rights under a theory of supervisory liability. *Id.*

Starting with her supervisory liability claim, the Court will address first whether Ms. Penman has made sufficient factual allegations to support each of her claims against Defendants White, Coleman, and Crews. The Court will then address the issue of qualified immunity.

A. Supervisory Liability Under 42 U.S.C. § 1983.

The theory of supervisory liability under 42 U.S.C. § 1983 permits supervisors to be held liable for their subordinates' unconstitutional conduct. *Casey v. Sanders*, No. 7:17-CV-145-KKC, 2018 U.S. Dist. LEXIS 103949, at *16 (E.D. Ky. June 21, 2018). However, it is well settled law that "[g]overnment officials may not be held liable for the unconstitutional behavior of their subordinates under the theory of respondeat superior." *Iqbal*, 556 U.S. at 676. Thus, supervisory liability is applicable only to limited circumstances in which the plaintiff has established three things: (1) unconstitutional conduct on behalf of the subordinate; (2) "active unconstitutional behavior" on behalf of the supervisor; and (3) a "causal connection between the defendant's wrongful conduct and the violation alleged." *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006) (holding unconstitutional conduct on behalf of the subordinate to be a prerequisite of supervisory liability under § 1983); *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (holding that a supervisor must be actively engaged in the subordinate's unconstitutional behavior); *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (finding there must be a causal connection between the supervisor's conduct and the subordinate's unconstitutional behavior).

To prove active unconstitutional behavior, "the plaintiff must prove that [the supervisor] did more than play a passive role in the alleged violations or show mere tacit approval of the goings on." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006). However, "'active' behavior does not mean 'active' in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation." *Peatross* 818 F.3d at 242. Implicit authorization, approval, or knowing acquiesce all constitute active

behavior sufficient to confer liability. *Id.* (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Phillips v. Roane Cty.*, 534 F.3d 531, 543 (6th Cir. 2008)).

Here, Ms. Penman alleges that the Defendants' subordinates used excessive force against Mr. Penman in violation of his Eighth Amendment rights. (Amended Comp. p. 16). The Defendants do not argue the underlying Eighth Amendment violations. Instead, they argue that Penman's supervisory liability claim must be dismissed because she has "failed to allege any facts showing that Defendants White, Crews, and Coleman directly participated in any unconstitutional conduct." (Def. Mot. to Dismiss, p. 6). Taking instruction from *Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016), the Court disagrees.

In *Peatross*, two Memphis Police Department Officers, Dunaway and McMillen, shot Anjustine Vanterpool while he was exiting a gas station. 818 F.3d at 233. Vanterpool's estate sued, among others, Toney Armstrong, the Director of the Memphis Police Department, in his individual capacity based on supervisory liability under 42 U.S.C. § 1983. *Id.* Vanterpool's estate alleged that department policies, practices, and custom for which Armstrong was responsible resulted in systemic deficiencies, causing a pattern of unconstitutional police shootings, which included Vanterpool's. *Id.* at 238. Vanterpool's estate alleged that Armstrong was aware of the systemic deficiencies and did nothing to cure them, but instead tried to cover them up by exonerating the two officers that unlawfully shot Vanterpool. *Id.* at 243. The Vanterpool estate further alleged that Armstrong's failure to properly hire, train, and supervise officers contributed to Vanterpool's death. *Id.* at 238. Armstrong moved to dismiss the claim. The district court denied Armstrong's motion, and the Sixth Circuit Court of Appeals affirmed the district court's decision. The Sixth Circuit held that the allegations, taken as true, "support[ed] the plausible inference that in the execution of his job functions, Armstrong at least knowingly acquiesced in the unconstitutional

10

conduct of Officers McMillen and Dunaway." *Id.* at 243. The Sixth Circuit further held that the Plaintiff had sufficiently alleged a causal connection between Armstrong's conduct and Vanterpool's injury in that the estate alleged "Armstrong was involved at least in part in creating and enforcing all department policies," and "that he failed to take action in the face of the growing use of excessive force by officers. . . ."

Like the Plaintiff in *Peatross*, Ms. Penman alleges that institutional policies, practices, and customs for which the Defendants were responsible resulted in systemic deficiencies, causing a pattern of unconstitutional conduct that includes the instant incident. (Pl's Am. Compl., p. 19: ¶ 79) ("The underlying violations of Mr. Penman's constitutional rights as described herein, were in furtherance of and consistent with policies and customs which Defendants White, . . . Coleman, [and] Crews, . . . promulgated, created, implemented or possessed responsibility for the continued operation of."); (Pl's Am. Compl., pp. 4-5: ¶¶ 11-14) (alleging that "[f]or years, the [Kentucky State Prison] has operated under a culture of indifference to inmates' safety and mental health needs," and citing the death of two other inmates). Also, like the Plaintiff in *Peatross*, Ms. Penman alleges that the Defendants were aware of the systemic deficiencies and did nothing to cure them, but instead tried to cover them up. (Pl.'s Am. Compl., p. 14: ¶ 58) ("Defendants White, . . . Coleman, [and] Crews, . . . knew, from previous litigation, critical incident investigations, complaints and the obviousness of the problems, that KSP's system of supervising and caring for inmates with serious mental health problems was dangerously deficient. Yet, in deliberate indifference to the health and safety of inmates like Mr. Penman, these Defendants failed to alleviate the known and/or obvious risks."); (Pl.'s Am. Compl., p. 3: ¶ 9) (alleging that KSP officials made false statements to the media and Penman's family regarding his death). Finally, like the Plaintiff in *Peatross*, Ms. Penman alleges that the Defendants' failure to properly hire,

train, and supervise subordinates contributed to the alleged unconstitutional conduct. (Pl.'s Am. Compl., p. 8: ¶ 9) ("Plaintiff's assertion of liability against the Defendants White, . . . Coleman[,] and Crews is based upon their failure to employ qualified individuals for positions of responsibility (or to terminate individuals upon demonstration of their lack of qualifications) . . . and their failure to properly train and supervise the employees for whom they were responsible.").

These allegations support the plausible inference that Defendants White, Coleman, and Crews played more than a passive role in the alleged underlying constitutional violations. Following the Sixth Circuit's guidance in *Peatross*, the Court must conclude that Ms. Penman has made sufficient factual allegations to suggest Defendants White, Coleman, and Crews—at a minimum—knowingly acquiesced in the constitutional violations of their subordinates. Furthermore, by alleging that Defendants White, Coleman, and Crews were responsible for the policies, practices, and customs that resulted in the systemic deficiencies that caused Penman's death, and that Defendants were aware that these deficiencies had caused death in the past but did nothing to resolve them, the Court is satisfied that Ms. Penman has made factual allegations sufficient to establish a causal connection between the Defendants' acts or omissions and Penman's death. Therefore, Ms. Penman has made sufficient factual allegations to support her supervisory liability claim under 42 U.S.C. § 1983.

B. Negligence

Ms. Penman brings claims against the Defendants for both ordinary negligence and gross negligence. The Court will address the two claims in turn, starting with ordinary negligence.

To state a cause of action for negligence, "a plaintiff must establish a duty on [behalf of] the defendant, a breach of the duty, and a causal connection between the breach of the duty and an injury suffered by the plaintiff." *Burke v. Thompson*, No. 5:15-CV-00007-TBR, 2016 U.S. Dist.

12

LEXIS 59032, at *24 (W.D. Ky. May 3, 2016) (quoting *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436-37 (Ky. Ct. App. 2001). "As a general principle, a prison official has the duty to ensure the 'reasonable safety' of inmates." *Ward v. Ky. State Reformatory*, No. 3:09-CV-315-H, 2011 U.S. Dist. LEXIS 64060, at *14 (W.D. Ky. June 15, 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

Here, Ms. Penman's Complaint makes sufficient factual allegations to support the inference that that White, Coleman, and Crews failed in supervising and training their subordinates, as well as failed to resolve the obvious and known deficiencies in KSP's system of supervising and caring for inmates with serious health problems. (Pl.'s Am. Compl., p. 15: ¶ 59) (listing deficiencies); (Pl.'s Am. Compl., pp. 14-15: ¶ 58) (alleging that White, Coleman, and Crews knew about the deficiencies). Ms. Penman alleges that these failures posed obvious risks to inmates' health and safety. (Pl.'s Am. Compl. pp. 14-15: ¶ 58) (alleging that Penman's death was foreseeable based on the known deficiencies). Therefore, Ms. Penman has made sufficient factual allegations to suggest that the Defendants have breached their duty as prison officials to keep inmates reasonably safe. Ms. Penman's Complaint further alleges that these failures, including the failure to supervise, were the proximate cause of Mr. Penman's death. (Pl.'s Am. Compl., p. 20: ¶ 83); (Pl.'s Am. Compl., p. 21: ¶ 96). Thus, taking the Plaintiff's allegations as true, the Court finds that Ms. Penman has pled sufficient factual allegations to support her negligence claim.

A claim for gross negligence requires the same showing as an ordinary negligence claim, but further requires the plaintiff to demonstrate that the defendant has acted with "'wanton or reckless disregard for the safety of other persons' such that the offending conduct is so outrageous that malice could be implied from the facts of the situation." *Estate of Presley v. CCS of Conway*,

No. 3:03CV-117-H, 2004 U.S. Dist. LEXIS 9583, at *11 (W.D. Ky. May 18, 2004) (quoting *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 52 (Ky. 2003)).

Here, Ms. Penman has alleged that Defendants White, Coleman, and Crews all acted with deliberate indifference to known and obvious risks. (Pl.'s Am. Compl., p. 15: ¶ 58). She alleges that all three Defendants knew that their indifference could result in the death. *Id.* Such allegations, taken as true, are sufficient to establish the Defendants acted with a reckless disregard for inmates' safety. The Court finds that such disregard is so outrageous that a jury could reasonably infer malice. Therefore, the Court cannot, at this time, dismiss Ms. Penman's gross negligence claim.

C. Intentional Infliction of Emotional Distress/Outrage

Under Kentucky law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *See* Restatement (Second) of Torts § 46. Kentucky law recognizes no distinction between intentional infliction of emotional distress and the tort of outrage. *Torres v. Am. Emplrs. Ins. Co.*, 151 F. App'x 402, 413 (6th Cir. 2005) (citing *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001). They are both "gap filler" torts. *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993). Thus, "where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie." *Id.*

Here, Ms. Penman has made no allegations from which it could be plausibly inferred that White's, Coleman's, or Crews's conduct was intended solely to cause extreme emotional distress

14

in Mr. Penman. Moreover, Ms. Penman may recover through the traditional tort of negligence, as already discussed. Therefore, Ms. Penman's intentional infliction of emotional must be dismissed.

D. Qualified Immunity

Defendants only argue qualified immunity under federal law. However, qualified immunity standards are different under Kentucky and federal law. The Court must apply federal law when analyzing Ms. Penman's federal supervisory liability claim, and state law when analyzing her state law negligence claim. *Funke v. Coogle*, No. 3:11-CV-310-H, 2013 U.S. Dist. LEXIS 7189, at *5 (W.D. Ky. Jan. 16, 2013) (citing *Crawford v. Lexington-Fayette Urban Cnty. Gov't*, 2007 U.S. Dist. LEXIS 2567, 2007 WL 101862, at *4 (E.D. Ky. Jan. 10, 2007); *King v. Taylor*, 694 F.3d 650, 662-64 (6th Cir. 2012)). Defendants failure to distinguish between the two standards does not affect the Court's determination. The facts pled in Ms. Penman's Complaint—which the Court must take as true—are sufficient for the Court to determine that Defendants, at this early stage in the proceedings, are not entitled to qualified immunity under either standard.

1. Federal Qualified Immunity

Under federal qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). "Qualified immunity also balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009). Determining whether defendants are entitled to qualified immunity involves two questions: First, based on applicable law and the

15

facts viewed in the light most favorable to the plaintiff, has a constitutional violation occurred? *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002). Second, if the answer to the first question is yes, was the constitutional right "clearly established" at the time of violation. *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). To be "clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Bell*, 308 F.3d at 602. In other words, "the unlawfulness [of the action] must be apparent." *Id*.

"The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." *Washington v. Newsome*, 977 F.2d 991, 995 (6th Cir. 1992) (citing *Wegner v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)). The plaintiff's burden extends to both prongs of the qualified immunity analysis—she must plausibly claim that a constitutional right has been violated and that the right was clearly established.

As Defendants correctly point out, "[q]ualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001) (*quoting Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Thus, qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *Forsyth*, 472 U.S. at 526. However, "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015). With this in mind, the Court turns to the Defendants' assertion of qualified immunity.

As previously discussed, the Court finds that the Ms. Penman plausibly alleges that the Defendants, through a theory of supervisory liability, have violated Mr. Penman's Eighth Amendment right to be free from the excessive use of force. Thus, Ms. Penman has carried her burden regarding the first prong. Furthermore, an inmate's right to be free from the unnecessary

and cruel infliction of pain after being restrained is a well-established right.[1] *See, e.g. Champion v. Outlook Nashville*, Inc., 380 F.3d 893, 903 (6th Cir. 2004) (finding spraying an inmate with pepper spray after he was detained and hobbled to be an Eighth Amendment violation). Thus, Defendants White, Coleman, and Crews are not, at this stage of the litigation, entitled to qualified immunity on Ms. Penman's supervisory liability claim. The claim shall proceed.

2. Kentucky Qualified Immunity

Qualified immunity under Kentucky law, "protects officials from liability for discretionary acts, taken in good faith, within their scope of authority." *Williams v. Sandel*, 433 F. App'x 353, 363 (6th Cir. 2011) (citing *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)). Thus, if the discretionary act is taken in bad faith, qualified immunity does not apply. Bad faith is "[t]he opposite of good faith, and it is not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 483 (Ky. 2006) (citations omitted). "Bad faith" can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position. *Yanero*, 65 S.W.3d at 523 (citing Harlow, 457 U.S. at 815).

Here, as already discussed at length, Ms. Penman plausibly alleges the Defendants have violated Mr. Penman's clearly established Eighth Amendment rights under a theory of supervisory liability. In the absence of proper training, and in the face of the known systemic

---

[1] When concerning a supervisory liability claim, the second prong of the qualified immunity analysis must be directed at the subordinate's conduct, not the supervisor's. In other words, it is whether the constitutional right the subordinate violated was clearly established—not whether the supervisor violated a clearly established right. *Peatross* 818 F.3d at 245. ("The Estate need not show that Vanterpool had a constitutional right to additional training or adequate supervision from Armstrong; it need only show that the right that Officers McMillen and Dunaway violated was clearly established at the time of the violation.") (citing Coley v. Lucas Cty., 799 F.3d 530, 540 (6th Cir. 2015) (focusing on whether the subordinates had violated a clearly established right in order to determine whether the supervisor was entitled to qualified immunity)).

deficiencies, Defendants knew, or should have known, that inmates, such as Penman, were in a dangerous position and likely to have their constitutional rights violated. Therefore, Ms. Penman has demonstrated more than "an honest mistake" on the Defendants' part, she has pled facts to plausibly allege bad faith. Thus, Defendants are not entitled to qualified immunity under Kentucky law, and Ms. Penman's state law negligence claim shall proceed.

CONCLUSION

For the foregoing reasons, is ordered as follows:

The Defendants Motion to Dismiss (R. 44) is HEREBY DENIED IN PART AND GRANTED IN PART.

Plaintiff's negligence, gross negligence, and supervisory liability claims shall proceed.

Plaintiff's intentional infliction of emotional distress claims is dismissed.

**IT IS SO ORDERED.**

*[Signature: Thomas B. Russell]*

**Thomas B. Russell, Senior Judge**
**United States District Court**
November 26, 2018

cc:	Counsel of Record