UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:18-CV-58-TBR

ALICE PENMAN,                                                                            PLAINTIFF

v.

CORRECT CARE SOLUTIONS, et al.,                        DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a Motion to Dismiss filed by Defendant Josh Patton. (R. 45). Plaintiff Ms. Alice Penman has responded (R. 49), and this matter is now ripe for adjudication. For the reasons that follow, the Court DENIES IN PART AND GRANTS IN PART the Defendants' motion to dismiss. (R. 45).

BACKGROUND

The following facts are taken from Plaintiff Alice Penman's Complaint and accepted as true for the purposes of considering the Defendants' Motion to Dismiss.

A. Inmate Penman's Death

Marcus Penman was an inmate at Kentucky State Penitentiary (KSP) where he was housed in the Seven Cell House Restrictive Housing Unit, Observation Cell #2. At around 1:50 PM on April 25, 2017, Unit Administrator Josh Patton observed Mr. Penman repeatedly beating on his cell door and running into it with his head and body. Ten minutes later, Lieutenant Kerwyn Walston notified Day Shift Commander Captain Garyth Thompson of Mr. Penman's behavior. At this point no medical or mental health personnel had been notified. Captain Thompson authorized a "Cell Entry Team" to enter Mr. Penman's cell, restrain him, and then place him in the restraint

1

chair. Around 2:05 PM, before the Cell Entry Team assembled at Mr. Penman's cell, Patton retrieved a video camera from the control center, and Officer Robert Harris started recording Mr. Penman. Mr. Penman continued to beat his head against his cell door, causing himself to bleed. He also began punching himself in the face.

Around 2:12 PM, the Cell Entry Team assembled outside Mr. Penman's cell. The Entry Team included: Lieutenant Walston, Officer Michael Lamb, Officer Steven H. Sargent, Officer James Corley, Officer Jose Bailey, Officer Jason Denny, Steve E. Sargent, and Officer Robert Harris—still equipped with the camera. All the officers were wearing full riot gear. Before entering the cell, Lieutenant Walston opened the cell's tray slot and observed Mr. Penman still throwing his head and body against the cell door. Walston began spraying Mr. Penman in the face with pepper spray through the tray slot. He sprayed Mr. Penman at least three separate times. Walston also shot Mr. Penman with a taser gun, lodging a dart in his skin through which Walston shocked Mr. Penman. He held the trigger, thereby electrocuting Mr. Penman, for at least seven seconds. Walston continued to intermittently shock Mr. Penman through the dart lodged in his skin. Walston then removed the first dart pack from the taser gun, reloaded it, and shot Mr. Penman again. This time Walston shocked Mr. Penman for upwards of 18-20 seconds at a time.

At around 2:17 PM, the Cell Entry Team entered Mr. Penman's cell. Upon entering the cell, Officer Steven H. Sargent proceeded to shock Mr. Penman with an electrified riot shield. Officer Sargent and Officer Denny then shackled Mr. Penman's legs. After restraining Mr. Penman's legs, Walston shocked Mr. Penman with his handheld taser. Officer Lamb then shackled Mr. Penman's hands while Officer Corley secured his head. After he was completely restrained, Walston again began to shock Mr. Penman with the taser.

2

From his cell, Mr. Penman was placed in a restraint chair. After he had been placed in the restraint chair, Walston continued to shock Mr. Penman with the handheld taser. Walston then placed a hood over Mr. Penman's head and face. Once Mr. Penman had been hooded, Officer Corely, upon instruction from Walston, cut off Mr. Penman's pants with a seatbelt cutter.

At this point, Nurse Bruce Bauer of Correct Care Solutions, LLC had arrived on scene. Officer Patton handed Bauer a pitcher of water that Bauer poured over Mr. Penman's hooded head. Around five minutes later, the officers unhood Mr. Penman to find him unconscious. He remained unconscious and was pronounced dead at the scene.

B. Claims Against Defendant Josh Patton

Ms. Penman's Complaint identifies Defendant Josh Patton as being a Correctional Unit Administrator (CUA) at KSP during all times pertinent to this litigation. According to Ms. Penman's Complaint, as a CUA, Patton was responsible for Mr. Penman's safety, as well as being responsible for the promulgation and enforcement of KSP policies, procedures, protocols, customs, and practices particular to his Unit.

Ms. Penman brings four claims against Patton—deliberate indifference to serious medical and/or mental health need in violation of the Eighth Amendment, failure to intervene under 42 U.S.C. § 1983, negligence, and intentional infliction of emotional distress or outrage under Kentucky common law.

1. Deliberate Indifference to a Serious Medical and/or Mental Health Need

In her deliberate indifference to a serious medical and/or mental health need claim, Ms. Penman alleges the following:

69. Lieutenant Walston, Nurse Bauer, Lamb, S. E. Sargent, S. H. Sargent, Corley,

Bailey, Harris, Denny and **Patton** knew there was a strong likelihood that Mr. Penman was in danger of serious personal harm, including death. Mr. Penman had obvious, serious and emergent mental health and medical issues that were known or obvious to these Defendants prior to his death.

70. Nonetheless, Lieutenant Walston, Nurse Bauer, Lamb, S. E. Sargent, S. H. Sargent, Corley, Bailey, Harris, Denny and Patton repeatedly disregarded the known and obvious risks to Mr. Penman's health and safety. As documented herein, these Defendants did nothing to secure medical assistance for Mr. Penman despite his obvious need for emergent mental health and medical evaluation, assessment and treatment.

(Pl's Am. Compl., p. 17: ¶¶ 68-70)

2. Failure to Intervene

In her failure to intervene claim, Ms. Penman alleges the following:

74. During the constitutional violations committed described above, Walston, Bauer, Lamb, Harris, Bailey, Corley, S. E. Sargent, S. H. Sargent, Patton and Denny stood by without intervening to protect Mr. Penman and prevent the repeated violations of Penman's constitutional rights, even though they had the duty and opportunity to do so.

75. As a direct and proximate result of Walston, Bauer, Lamb, Harris, Bailey, Corley, S. E. Sargent, S. H. Sargent, Patton and Denny's failure to protect and failure to intervene to prevent the violation of Mr. Penman's constitutional rights, Mr. Penman suffered the injuries and damages as alleged herein (including death).

76. These Defendants had a reasonable opportunity to prevent this harm but failed to do so.

(Pl's Am. Compl., p. 18: ¶¶ 74-76).

3. Negligence

In her negligence claim, Ms. Penman alleges the following:

95. By virtue of the foregoing, all Defendants were negligent and grossly negligent in their treatment of Mr. Penman; in addition, the medical professionals responsible for Mr. Embry's care failed to meet the standard of care applicable to their professions in their treatment of Mr. Embry.

96. As a direct and proximate result of the negligence, Mr. Penman suffered the injuries and damages as alleged herein.

(Pl's Am. Compl., pp. 21-22: ¶¶ 98-99).

4. Intentional Infliction of Emotional Distress/Outrage

In her emotional distress claim, Ms. Penman alleges the following:

98. Defendants' treatment of Mr. Penman was so beyond the bounds of human decency that it exemplifies the tort of outrage.

99. As a direct and proximate result of this conduct, Mr. Penman suffered the injuries and damages as alleged herein.

(Pl's Am. Compl., pp. 21-22: ¶¶ 98-99).

STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a plaintiff's complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." "Rule 12(b)(6) provides that a complaint may be dismissed for failure to state a claim upon which relief can be granted." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998). Importantly, "[w]hen considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district

court must accept all of the allegations in the complaint as true, and construe the complaint liberally in favor of the plaintiff." *Lawrence v. Chancery Court of Tennessee*, 188 F.3d 687, 691 (6th Cir. 1999). Thus, "unless it can be established beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," the motion should be denied. *Achterhof v. Selvaggio*, 886 F.2d 826, 831 (6th Cir. 1989). "However, the Court need not accept as true legal conclusions or unwarranted factual inferences." *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir. 2002). A "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Andrews v. Ohio*, 104 F.3d 803, 806 (6th Cir. 1997).

Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This means that the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* The concept of "plausibility" denotes that a complaint should contain sufficient facts "to state a claim to relief that is plausible on its face." *Id.* at 570. The element of plausibility is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). But where the court is unable to "infer more than the mere possibility of misconduct, the complaint has alleged—but has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 (internal quotation marks omitted).

DISCUSSION

Patton moves to dismiss all Ms. Penman's claims against him. He makes specific arguments concerning the deliberate indifference claim, the failure to intervene claim, and the intentional infliction of emotional distress claim, and asserts that all Ms. Penman's claims are barred by qualified immunity. Additionally, Patton argues that any claims made against him in his official capacity are barred by the Eleventh Amendment. Starting with the deliberate indifference claim, the Court will address each of Patton's claim specific arguments. The Court will then address whether Patton is entitled to qualified immunity. Finally, the Court will address Patton's assertion of Eleventh Amendment immunity regarding any claims brought against him in his official capacity.

A. Deliberate Indifference to a Serious Medical and/or Mental Health Need

The Eighth Amendment grants inmates the right to be free from cruel and unusual punishment. This right extends to protect inmates from prison officials' deliberate indifference to prisoners' serious medical needs, including psychiatric ones. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (holding that deliberate indifference to prisoners' serious medical needs constitutes the type of unnecessary and wanton infliction of pain prohibited by the Eighth Amendment); *See Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (noting that a "prison inmate has [an] Eighth Amendment right [to] be free from deliberate indifference to serious psychiatric needs. A deliberate indifference claim under the Eighth Amendment has both an objective and a subjective component. *Comstock* 273 F.3d at 702 (citing Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). The objective component requires the existence of a sufficiently serious medical need. *Turner v. City of Taylor*, 412 F.3d 629, 646 (6th

Cir. 2005). "[A] medical need is objectively serious if it is ' . . . so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). To satisfy the subjective component, the defendant must possess a "sufficiently culpable state of mind," rising above negligence or even gross negligence and being "tantamount to intent to punish." *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). In other words, "[a] prison official acts with deliberate indifference if he knows of a substantial risk to an inmate's health, yet recklessly disregards the risk by failing to take reasonable measures to abate it." *Taylor v. Boot*, 58 F. App'x 125, 126 (6th Cir. 2003) (citing *Farmer*, 511 U.S. at 837-47).

Simply put, Patton's argument boils down to this—Because Ms. Penman's Complaint only alleges that Patton witnessed Mr. Penman slam his head against the cell one time, he could not have known Mr. Penman was suffering from of any serious mental health or medical issues and therefore, Ms. Penman's Deliberate indifference claim must be dismissed. Ms. Penman responds that her Complaint never alleges that Patton only saw Mr. Penman throw himself against the cell door one time. Rather, her Complaint establishes, implicitly and explicitly, that Patton observed more than enough to alert him that Mr. Penman was suffering from a serious mental health issue. The Court agrees with Ms. Penman.

Patton's position is that the Complaint only alleges he observed Mr. Penman throw himself into the cell door once. However, paragraph 36 states as follows:

> 36. At approximately 2:05 p.m., Unit Administrator Patton retrieved a video camera from the Seven Cell House Control Center. Officer Robert Harris began recording Mr. Penman's behavior. Mr. Penman continued to strike his head on the cell door, causing

himself to bleed. Mr. Penman began punching himself in the face.

(Pl's Am. Compl., p. 10: ¶ 36). Patton would have the Court read this paragraph as having him hand the camera off to Harris and immediately leaving the scene. But the Court is obligated to read the Complaint in the light most favorable to the Plaintiff. When taken in the light most favorable to the Plaintiff, this paragraph, along with Patton's alleged later participation, leads the Court to plausibly infer that after Patton handed the video camera off to Harris, he stayed and observed Mr. Penman continue to throw himself into the cell door and punch himself in the face—not that Patton handed the camera off and then left the scene, having observed nothing. When an inmate starts punching himself in the face and hitting his head against a door hard enough to draw blood, he presents an obvious risk to his own safety. The Court, interpreting Ms. Penman's Complaint as having alleged Patton to have observed Mr. Penman doing just that, must find that Patton knew of a substantial risk to Mr. Penman's health. Furthermore, the Court finds that Patton's failure to alert medical staff, could be construed as recklessly disregarding the risk that Mr. Penman obviously posed to himself. Therefore, Ms. Penman has alleged a plausible deliberate indifference claim against Patton. Frankly, this is better resolved at the summary judgment stage of the proceedings and after discovery—not prior to it.

   B.  Failure to Intervene

Under 42 U.S.C. § 1983 an officer may be held liable for failing to intervene to prevent another from using excessive force. *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982). To state a failure to intervene claim, the plaintiff must establish that an officer observed or had reason to know that excessive force would be or was used, and the officers had the means and opportunity to prevent the harm. *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008). But the officer must have "a realistic opportunity to prevent the harm." *Wells v. City of Dearborn Heights*, 538 F.

App'x 631, 640 (6th Cir. 2013) Where the constitutional violation occurs in a "fleeting point[] in time," officers cannot be held liable for their failure to intervene. *Id*.

Here, Patton argues that nurse Bauer pouring the water over Mr. Penman's head—the only unconstitutional behavior he was alleged to have been present for—was so brief that it prevented him from intervening. Patton's argument fails for two reasons: First, as already discussed, the Complaint plausibly suggests that Patton was on scene for the entirety of Mr. Penman's cell extraction, during which excessive force was used against Mr. Penman multiple times. Second, even assuming that Patton was only on scene to witness nurse Bauer pour the water over Mr. Penman's head, he had a realistic opportunity to prevent nurse Bauer's conduct.

First, the Court is satisfied that the Complaint makes allegations from which it can be plausibly inferred that Patton was on scene for the entirety of Mr. Penman's cell extraction. As already discussed, paragraph thirty-six, when read in the light most favorable to Ms. Penman, plausibly suggests that Patton retrieved the video camera for Officer Harris and remained on scene—not that he retrieved the camera for Officer Harris and then left the scene. Thus, Patton was on scene to witness Officer Walston repeatedly violate Mr. Penman's Eighth Amendment rights by electrocuting Mr. Penman multiple times after he had been adequately restrained. These were not fleeting moments. The Complaint alleges that at one point, Officer Walston held the taser's trigger for upwards of 15 seconds. (Pl's Am. Compl., p. 11: ¶ 40). The Complaint also alleges that Walston continued to shock Mr. Penman after he was placed in the restraint chair. There was ample time for Patton to make some attempt at preventing Officer Walston's ongoing behavior. Thus, Patton's argument starts from a false premise and is unpersuasive.

But even accepting that Patton was only on scene to witness nurse Bauer's conduct, his argument still fails. Patton is correct that pouring water over some one's head occurs in a moment's

time. However, the Complaint alleges that Patton handed Bauer the pitcher. The inference that Patton was aware of what nurse Bauer intended to do with the pitcher once Patton handed it to him, is more than plausible. Thus, Patton presumably had a realistic opportunity to prevent the harm; He could have simply refused to hand Bauer the pitcher. Patton's argument fails. Ms. Penman has pled a plausible failure to intervene claim against Patton. Again, these arguments can be better addressed at the summary judgment.

C. Intentional Infliction of Emotional Distress/Outrage

Under Kentucky law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *See* Restatement (Second) of Torts § 46. Kentucky law recognizes no distinction between intentional infliction of emotional distress and the tort of outrage. *Torres v. Am. Emplrs. Ins. Co.*, 151 F. App'x 402, 413 (6th Cir. 2005) (citing *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001). They are both "gap filler" torts. *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993). Thus, "where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie." *Id.*

Here, Officer Patton is alleged to have engaged in unacceptable behavior—even unconstitutional behavior. While this alleged behavior may be reprehensible, Ms. Penman has made no allegations from which it could be plausibly inferred that Patton's conduct was intended solely to cause extreme emotional distress in Mr. Penman. Moreover, Ms. Penman may recover

through the traditional through her traditional negligence claim. Therefore, Ms. Penman's intentional infliction of emotional must be dismissed.

D. Qualified Immunity

Defendants argue that they are entitled to qualified immunity under federal law. However, the facts pled in Ms. Penman's Complaint—which the Court must take as true—are sufficient for the Court to determine that Patton, at this early stage in the proceedings, is not entitled to immunity.

Under federal qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). "Qualified immunity also balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009). Determining whether defendants are entitled to qualified immunity involves two questions: First, based on applicable law and the facts viewed in the light most favorable to the plaintiff, has a constitutional violation occurred? *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002). Second, if the answer to the first question is yes, was the constitutional right "clearly established" at the time of violation. *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). To be "clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Bell*, 308 F.3d at 602. In other words, "the unlawfulness [of the action] must be apparent." *Id*.

"The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." *Washington v. Newsome*, 977 F.2d 991, 995 (6th Cir. 1992) (citing *Wegner v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)). The plaintiff's burden extends to both prongs of the qualified immunity analysis—she must plausibly claim that a constitutional right has been violated and that the right was clearly established.

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001) (*quoting Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Thus, qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *Forsyth*, 472 U.S. at 526. However, "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015). With this in mind, the Court turns to Patton's assertion of qualified immunity.

Like the rest of Patton's arguments, his assertion of qualified immunity is premised on his underlying argument that the Complaint fails to allege that he was present during the cell extraction. As already discussed, that argument fails. Thus, so too does his assertion of qualified immunity. As has already been discussed, the Complaint sufficiently alleges that Patton violated Mr. Penman's constitutional rights through deliberate indifference to Mr. Penman's serious medical and mental health needs and through the failure to intervene in Officer Walston's and nurse Bauer's use of excessive force. Moreover, these rights were clearly established at the time Officer Patton violated them. *See Comstock*, 273 F.3d at 703 ( "[W]e have long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner."); *See also, Bruner* 684 F.2d 422, 426 (6th Cir. 1982) (finding an officer may be held liable for failing to intervene to prevent another from using

excessive force). Therefore, at this early stage of the proceedings, Patton is not entitled to qualified Immunity. With the exception of her intentional infliction of emotional distress claim, Ms. Penman's claims shall proceed.

E. Eleventh Amendment Immunity

Patton argues that he is entitled to dismissal of Ms. Penman's claims brought against him in his official capacity because they are barred by the Eleventh Amendment. Ms. Penman brings no claims against Patton in his official capacity. The Issue is moot.

CONCLUSION

For the foregoing reasons, is ordered as follows:

The Defendant Josh Patton's Motion to Dismiss (R. 45) is HEREBY DENIED IN PART AND GRANTED IN PART.

With the exception of her intentional infliction of emotional distress claim, Plaintiff's claims shall proceed.

**IT IS SO ORDERED.**

*Thomas B. Russell*

Thomas B. Russell, Senior Judge
United States District Court

November 26, 2018

cc: Counsel of Record