## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
### PADUCAH

| | | |
|---|---|---|
| ALICE PENMAN, Administrator of Estate of Marcus Penman, Deceased, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. 5:18-cv-00058 (TBR) |
| CORRECT CARE SOLUTIONS, LLC, et al., | ) ) | |
| *Defendant.* | ) ) | |

### MEMORANDUM OPINION AND ORDER

This matter is before the Court upon four motions for summary judgment.

Defendants James Corley, Jason Denny, Robert Harris, Michael Lamb, S.E. Sargent, and S.H. Sargent have filed a motion for summary judgment, (Corley, et al., Mot. for Summ. J.), Dkt 181.  Plaintiff Alice Penman, as the Administrator of the Estate of Marcus Penman, has responded, (Resp. to Corley, et al., Mot. for Summ. J.), Dkt. 209.  Defendants Corley, Denny, Harris, Lamb, S.E. Sargent, and S.H. Sargent have replied, (Corley, et al., Reply), Dkt. 215.

Defendant Josh Patton has filed a motion for summary judgment, (Patton Mot. for Summ. J.), Dkt. 186.  Plaintiff has responded, (Resp. to Patton), Dkt. 211.  Defendant Patton has replied, (Patton Reply), Dkt. 219.

Defendants Deborah Coleman, Cookie Crews, and Randy White have filed a motion for summary judgment, (Coleman, et al., Mot. for Summ. J.), Dkt. 191.  Plaintiff has responded, (Resp. to Coleman, et al.), Dkt. 210.  Defendants Coleman, Crews, and White have replied, (Coleman, et al., Reply), Dkt. 222.

1

Defendant Kerwyn Walston has filed a motion for summary judgment, (Walston Mot. for Summ. J.), Dkt. 197.  Plaintiff has responded, (Resp. to Walston), Dkt. 212.  Defendant Walston has replied, (Walston Reply), Dkt. 217.

As such, briefing is complete and this matter is ripe for adjudication.

For the following reasons, it is **ORDERED** that the Corley, et al., Mot. for Summ. J., Dkt. 181, is **DENIED**; the Patton Mot. for Summ. J., Dkt. 186, is **DENIED**; the Coleman, et al., Mot. for Summ. J., Dkt. 191, **GRANTED**; and the Walston Mot. for Summ. J., Dkt. 197, is **DENIED**.

The Court has been informed that all claims against Correctional Care Solutions (CCS) and Bruce Bauer have been settled.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On April 25, 2017, Marcus Penman, an inmate at the Kentucky State Penitentiary (KSP), died.  This case arises from the circumstances surrounding Penman's death.  But in order to fully understand what happened on April 25, 2017, the Court begins with events that occurred earlier that month.

According to Plaintiff's pleadings, Penman suffered from serious mental health conditions such as bipolar disorder and antisocial personality disorders.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 6.  Plaintiff provides numerous examples of how these disorders manifested themselves through manic episodes and other bizarre and disruptive behaviors.  *See id.* at 7–10.  For instance, Plaintiff claims that on April 2, 2017, Penman refused to return his food tray.  *See id.* at 7.  That behavior escalated, Plaintiff says, when two days later Penman threw a food tray at prison staff and yelled "they're trying to kill me."  *See id.* at 8 (emphasis

2

omitted).  Plaintiff notes that there is no indication that any mental health professional was contacted as a result of either of these episodes.  *See id.* at 7–8.

Then, on April 5, 2017, Penman allegedly wrapped a sheet around his neck and stated that he wanted to kill himself.  *See id.* at 8.  After this, Plaintiff claims that KSP placed Penman on mental health watch, though Plaintiff maintains that Penman did not receive any medication management during this time.  *See id.*  While Penman was on this mental health watch, Donald Reaney, a mental health provider, allegedly reported that Penman was engaging in self-harming behavior such as "banging his head on his cell door."  *See id.* at 8–9 (emphasis omitted).  However, as Plaintiff tells it, Reaney concluded that Penman "was having situational difficulties 'in the yard' " and "was just 'in a rut.' "  *Id.* at 9.  As a result, Plaintiff describes Reaney as "provid[ing] no care at all."  *Id.*

Plaintiff next states that Penman's suicidal ideations resurfaced on April 12, 2017, when he wrote on a sick call request that he was "unstable and part of the suicide squad."  *Id.* (emphasis omitted).  To this, Plaintiff says that Tonya Gray, the mental health counselor at KSP, "provided no assistance at all," not even a face-to-face exam.  *Id.*  Plaintiff also asserts that when Penman went on a hunger strike two weeks later, Gray concluded that Penman was simply "trying to present as psychotic."  *Id.*  Plaintiff claims that Gray, like Reaney, failed to provide any assistance or care.  *See id.* at 9–10.

This brings us to April 25, 2017.  On that date, Penman was being housed in an observation cell inside of the Seven Cell House Restrictive Housing Unit (Cell House Seven).  *See* Amended Complaint, (Am. Compl.), Dkt. 79, ¶ 31.  The Amended Complaint claims that at approximately 1:50 p.m. Josh Patton observed Penman "beating on his cell door with his fists and running into the cell door with his body and head."  *Id.*  Patton, a Correctional Unit

3

Administrator II (CUA II), was supervising Cell House Seven and was responsible for the welfare of inmates housed there.  *See id.* ¶¶ 25, 31; *see also* Resp. to Corley, et al., Mot. for Summ. J. at 10 n.3.  Plaintiff asserts that upon seeing Penman's violent behavior, Patton told Penman that he would be placed in the restraint chair[1] if he did not stop.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 11.  The Amended Complaint maintains that Penman continued to strike his head on the cell door and began punching himself.  *See* Am. Compl. ¶ 31.  Plaintiff claims that at this time no mental health or medical health personnel were notified of Penman's behavior.  *See id.*

Ten minutes later, at approximately 2:00 p.m., Lieutenant Kerwyn Walston, a KSP officer, allegedly notified his captain of Penman's behavior.  *See id.* ¶ 32.  According to the Amended Complaint, the captain authorized a cell entry team to enter Penman's cell, control him, and then place him in a restraint chair.  *See id.* ¶ 33.  Plaintiff again states that at this time no mental health or medical personnel were notified of Penman's behavior.  *See id.* ¶ 32.

According to the Amended Complaint, five minutes after that, at 2:05 p.m., Patton provided a video camera to KSP Officer Robert Harris.  *See id.* ¶ 34.  Harris began filming Penman and recorded what happened next.  *See id.*

The cell entry team, clad in riot gear, arrived outside Penman's cell at approximately 2:12 p.m.  *See id.* ¶ 35.  The team was comprised of Walston, KSP Officer Michael Lamb, KSP Officer James Corley, KSP Officer S.H. Sargent, KSP Officer Jose Bailey, KSP Officer Jason Denny, and KSP Officer S.E. Sargent.  *See id.* ¶ 35.  Plaintiff describes how each officer had a different role in restraining Penman: Walston was equipped with pepper spray and a taser; Lamb was equipped with metal wrist restraints; Corley was equipped with metal leg restraints; S.H.

---

[1] The restraint chair is a chair that uses straps and belts to secure a person's arms, legs, and torso in an upright sitting position.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 11.

Sargent was equipped with an electronic stun shield; and Bailey, Denny, and S.E. Sargent were tasked with assisting in the cell entry.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 12.

At 2:14 p.m. Penman was still running headfirst into his cell door and hitting the door with his fists.  *See* Am. Compl. ¶ 36.  Plaintiff asserts that that's when Walston used the open tray slot door to spray Penman directly in the face with pepper spray, starting and stopping on three separate occasions.  *See id.*; *see also* Resp. to Corley, et al., Mot. for Summ. J. at 12.  According to Plaintiff, a minute or two later, at either 2:15 p.m. or 2:16 p.m., Walston aimed his taser through the open tray slot and struck Penman with an X26 taser dart pack.  *See* Am. Compl. ¶ 37; *see also* Resp. to Corley, et al., Mot. for Summ. J. at 13.  Plaintiff alleges that Walston activated the taser for seven seconds and then again for five seconds.  *See* Am. Compl. ¶ 37; *see also* Resp. to Corley, et al., Mot. for Summ. J. at 13.  That jolt of electricity knocked Penman to the floor, Plaintiff says.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 13.  However, Penman pulled the taser darts out of his body and got back up on his feet.  *See id.*  Plaintiff alleges that Walston then used a second and a third X26 taser dart pack on Penman, this time activating the taser for five seconds and eighteen seconds, respectively.[2]  *See* Resp. to Corley, et al., Mot. for Summ. J. at 13.

Plaintiff next asserts that the cell entry team entered Penman's cell at 2:17 p.m.  *See* Am. Compl. ¶ 39.  Once inside, S.H. Sargent allegedly pushed his electronic stun shield against Penman and shocked him.  *See id.*  According to Plaintiff, the cell entry team piled on top of Penman and secured his arms and legs with metal restraints.  *See id.*  Plaintiff claims that

---

[2] Plaintiff claims in the Resp. to Corley, et al., Mot. for Summ. J. that Walston deployed three taser dart packs.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 13.  In the Amended Complaint, however, Plaintiff states that Walston only deployed two dart packs.  *See* Am. Compl. ¶ 38.  Despite this apparent difference, it is possible that Plaintiff's responses and Amended Complaint both allege that Penman was tased for around thirty-five seconds.  The Amended Complaint states that after initially deploying the first dart pack, Walston "continued to shock" Penman.  *Id.* ¶ 37.  Likewise, the Amended Complaint states that after the second dart pack struck Penman, Walston "activated the handheld taser device multiple times."  *Id.* ¶ 38.  The Court notes this discrepancy for clarification purposes.

Walston then used the "drive stun mode" of his taser—that's when the taser is put in direct contact with a person's body—and shocked Penman two additional times.[3]  *See id.*; *see also* Resp. to Corley, et al., Mot. for Summ. J. at 14.

With Penman restrained, the cell entry team removed him from the cell and placed him in the restraint chair.  *See* Am. Compl. ¶¶ 40–41.  Plaintiff alleges that while the officers were positioning Penman in the restraint chair, Bailey put Penman in a chokehold, placing his right hand around Penman's neck.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 16.  The Amended Complaint further alleges that while this was happening, S.H. Sargent began to press the stun shield over Penman's body and face.  *See* Am. Compl. ¶ 42.  Next, Plaintiff claims that Walston again shocked Penman using the drive stun mode of his taser.  *See id.* ¶ 41; *see also* Resp. to Corley, et al., Mot. for Summ. J. at 16.  Plaintiff states that at this time Penman began making a "high-pitched wheezing-type sound," the medical term for which is stridor.  Resp. to Corley, et al., Mot. for Summ. J. at 17.  Plaintiff asserts that the officers, undeterred by the wheezing noise, then placed a spit hood over Penman's face.[4]  *See* Am. Compl. ¶ 41; *see also* Resp. to Corley, et al., Mot. for Summ. J. at 40.  According to Plaintiff, the officers continued by overtightening the chair's chest strap, which allegedly made it even more difficult for Penman to breathe.  *See* Am. Compl. ¶ 44.  Then the Amended Complaint states that, at the direction of Walston, Corley cut Penman's pants off.  *See id.* ¶¶ 44–45.  Plaintiff maintains that throughout all of this, S.H. Sargent continued to keep the stun shield pressed over Penman.  *See id.* ¶ 42.

---

[3] Although the Plaintiff's responses claim that "[t]he drive stun shocks occurred after [] Penman was in handcuffs and leg restraints," Resp. to Corley, et al., Mot. for Summ. J. at 15, the Amended Complaint states that the drive stun shocks occurred both before and after the metal wrist restraints were secured, but after the leg restraints were secured *see* Am. Compl. ¶¶ 39–40.  Again, the Court notes this possible discrepancy for clarification purposes.
[4] It is unclear to the Court who Plaintiff alleges put the hood over Penman's face.  On the one hand, the Amended Complaint alleges that "Walston then put a hood over [] Penman's head and face."  Am. Compl. ¶ 41.  On the other hand, Plaintiff's responses states that "we see Officer Corley place a spit hood over [] Penman's face."  Resp. to Corley, et al., Mot. for Summ. J. at 20.

At some point during the above-described incident, Penman stopped breathing and went unconscious. *See* Resp. to Corley, et al., Mot. for Summ. J. at 19–22. As Plaintiff describes it, the officers acted with "zero urgency" to provide medical care. *Id.* at 21 (emphasis omitted). Similarly, Plaintiff asserts that Nurse Bauer, an employee of Correct Care Solutions (CCS) who had arrived on scene sometime earlier, just called out "Penman!" rather than taking any medical action.[5] *Id.* at 21. Plaintiff states that Patton eventually requested for Penman be removed from the restraint chair. *See* Resp. to Corley, et al., Mot. for Summ. J. at 22. According to Plaintiff, a couple of minutes after Patton's request the officers and other medical staff began providing airway assistance and engaging in resuscitation efforts. *See id.* But at that point it was too late. Penman was officially declared dead at 2:52 p.m. on April 25, 2017. *See id.*

According to Plaintiff, many of the officers' actions violated Kentucky Department of Corrections' (KDOC) policies. Here, Plaintiff asserts that in spite of KDOC policies requiring otherwise: none of the six officers that Walston mobilized had any training in the use of pepper spray or tasers; none of the officers followed proper decontamination procedure after the pepper spray was used; none of the officers, including Walston, had any training in cell extraction; S.H. Sargent had no training or experience with the stun shield; none of the officers, including Walston, had any training on the use of the restraint chair; and Bailey had never been trained on the dangers of using a chokehold. *See* Resp. to Corley, et al., Mot. for Summ. J. at 16, 26–29.

After Penman's death, Plaintiff alleges that KSP officials falsely suggested to the media that Penman died as a result of self-inflicted trauma. *See id.* at 22; *see also* Am. Compl. ¶ 9. This, Plaintiff claims, is contrary to the autopsy and investigation performed by the Western Kentucky Regional Medical Examiner's Office. *See* Resp. to Corley, et al., Mot. for Summ. J. at

---

[5] Plaintiff notes that both Bauer and CCS were responsible for providing on-site medical and mental health care to Penman while he was housed at KSP. See Am. Compl. ¶¶ 20, 27.

24.  According to Plaintiff, the Medical Examiner's Office concluded that the "immediate cause" of Penman's death was "asphyxia by compression of the neck," while the "contributing" causes were blunt force trauma to the head and cardiomegaly.  *Id.*

Plaintiff now brings the following claims against the officers.  Count One is an Eighth Amendment claim regarding excessive use of force, brought pursuant to 42 U.S.C. § 1983 against Walston and S.H. Sargent.  *See* Am. Compl. ¶¶ 59–66.  Count Two is an Eighth Amendment claim regarding deliberate indifference to a serious medical or mental health need, brought pursuant to 42 U.S.C. § 1983 against Walston, Lamb, S.E. Sargent, S.H. Sargent, Corley, Bailey, Harris, Denny, and Patton.  *See id.* ¶¶ 67–71.  Count Three is a failure to intervene and failure to protect claim, brought pursuant to 42 U.S.C. § 1983 against Walston, Lamb, S.E. Sargent, S.H. Sargent, Corley, Bailey, Harris, Denny, and Patton.  *See id.* ¶¶ 72–76. Count Four is a claim for supervisory liability, brought pursuant to 42 U.S.C. § 1983 against Walston.  *See id.* ¶¶ 77–83.  Count Six is a claim for negligence/wrongful death brought against Walston, Lamb, S.E. Sargent, S.H. Sargent, Corley, Bailey, Harris, Denny, Patton, and CCS.  *See id.* ¶¶ 93–95.

Additionally, Plaintiff brings claims against Randy White, the Warden of KSP; Deborah Coleman, the Mental Health Director of the KDOC; and Cookie Crews, the Health Services Administrator of the KDOC.  *See* Am. Compl. ¶¶ 21–23.  The claims here stem from what Plaintiff alleges was a knowing maintenance of an unconstitutional health care system, which resulted in the death of multiple inmates, including Penman.  *See id.*  To support these claims, Plaintiff cites the recent deaths of three inmates at other KDOC facilities—Steven McStoots, James Embry, and Clifford Warfield.  *See* Resp. to Coleman, et al., at 29–32.  Plaintiff alleges that McStoots' death was caused by a "remarkably similar set of circumstances" to Penman's

case, *i.e.*, "the cell extraction of an inmate with serious mental illness and the application of restraints by a team of officers entirely lacking training on the methods they were using." *Id.* at 29–30.  Embry starved himself to death over a period of forty-five days.  *See id.* at 31.  And according to Penman, KSP "flatly refused to provide [] Embry with medically necessary mental health medication and treatment, despite his pleas for help and blatant need."  Am. Compl. ¶ 12. Similarly, Penman claims that Warfield, who had a documented history of bowel obstructions, began to exhibit the classic signs of bowel obstruction.  *See id.* ¶ 11.  However, the KSP physician diagnosed Warfield as malingering and placed him in disciplinary segregation, where his condition became terminal.  *See id.*

The specific claims brought against White, Coleman, and Crews are as follows.  Count Four is a claim for supervisory liability, brought pursuant to 42 U.S.C. § 1983 against White, Coleman, and Crews.  *See id.* ¶¶ 77–83.  Count Six is a claim for negligence/wrongful death brought against White, Coleman, and Crews.  *See id.* ¶¶ 93–95.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *See Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a

mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  The plaintiff may accomplish this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . " Fed. R. Civ. P. 56(c)(1).  Mere speculation will not suffice to defeat a motion for summary judgment, "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## III.    DISCUSSION

Many of the Defendants have set forth multiple grounds for summary judgment.  First, each Defendant who filed a motion for summary judgment challenges Plaintiff's claims against him, presenting arguments that Plaintiff fails to set forth a viable excessive use of force claim, deliberate indifference claim, failure to intervene claim, supervisory liability claim, and wrongful death claim.  Second, each Defendant who filed a motion for summary judgment argues that he or she is entitled to qualified immunity.

### A.  Excessive Use of Force

The Eighth Amendment prohibits the Government from imposing "cruel and unusual punishment" upon prisoners.  U.S. CONST. amend. VIII.  However, not every shove or restraint gives rise to a constitutional violation. *See Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014).  That's because sometimes "[t]he maintenance of prison security and discipline may require that inmates be subjected to physical contact actionable as assault under common law." *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002).  Prison officials nonetheless violate the

Eighth Amendment when "their 'offending conduct reflects an unnecessary and wanton infliction of pain.' " *Cordell*, 759 F.3d at 580 (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)).

An Eighth Amendment excessive force claim has both a subjective component and an objective component. *See Cordell*, 759 F.3d at 580 (citing *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013)). The subjective component focuses on the state of mind of the prison officials. *See id.* Therefore, under the subjective component, a court must ask "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). In *Hudson v. McMillian*, the Supreme Court held that this analysis is guided by a number of factors, including: (1) "the extent of the inmate's injury;" (2) "the need for the application of force;" (3) "the relationship between that need and the amount of force used;" (4) "the threat that the officials reasonably perceived;" and (5) "any efforts to temper the severity of a forceful response." 503 U.S. at 7. By contrast, the objective component focuses on the force that the corrections officers used. *See id.* The objective component requires that the pain inflicted be "sufficiently serious," *id.* (quoting *Williams*, 631 F.3d at 383, to offend "contemporary standards of decency," *id.* (quoting *Hudson*, 503 U.S. at 8). "While the extent of a prisoner's injury may help determine the amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred." *Id.* at 580–81 (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)).

Plaintiff alleges that Walston's "repeated use of violent force on [] Penman" and S.H. Sargent's "use of the shield on Penman while he was fully restrained" constitute excessive and unreasonable force. Am. Compl. ¶¶ 61–64. The Court will address these allegations as they pertain to both Defendants.

11

### 1. *Walston*

Plaintiff alleges that Walston used excessive force "by repeatedly applying a 'Taser' to Penman after he was restrained, subdued, no longer resisting[,] and in a state of obvious physical distress." Resp. to Walston Mot. for Summ. J. at 39. Specifically, Plaintiff maintains that Walston administered three unnecessary drive stun shocks: two while Penman was in handcuffs and leg restraints in his cell, and one while Penman was subdued in the restraint chair. *See id.* at 41. Walston claims that the record fails to present sufficient facts to establish a violation of a constitutional right with regard to his use of a taser. *See* Walston Mot. for Summ. J. at 2–3.[6]

#### i. *Subjective*

The five *Hudson* factors guide this analysis. First is the extent of the injury. *See Hudson*, 503 U.S. at 7. Plaintiff argues that because Walston's conduct caused Penman unnecessary and extensive pain, and because Penman died, this factor suggests that Walston's use of force was excessive. *See* Resp. to Walston Mot. for Summ. J. at 41; *see also McKinney v. Lexington-Fayette Urb. Cty. Gov't*, 651 F. App'x 449, 465 (6th Cir. 2016). Yes, it appears that Plaintiff does not allege that Walston's use of the taser in drive stun mode caused Penman's death.[7] *See* Resp. to Walston Mot. for Summ. J. at 41; *see also* Walston Reply at 3. However, Plaintiff's allegation is still relevant to the issue of excessive force because she asserts that Walston's use of the taser caused *an* injury. Therefore, the first factor weighs in favor of Plaintiff.

---

[6] Walston also argues that his use of pepper spray and his tightening of the restraint chair straps do not give rise to an excessive force claim. *See* Walston Mot. for Summ. J. at 1, 6–7. However, Plaintiff's response makes clear that the only allegation of excessive force against Walston pertains to his use of a taser while Penman was restrained. *See* Resp. to Walston Mot. for Summ. J. at 39–42. The Court therefore does not address whether Walston's use of pepper spray or tightening of the restraint chair straps constitutes excessive force.

[7] It appears that, at most, Plaintiff alleges that Walston's use of the taser darts "may be associated with an altered mental status which can contribute to airway compromise." Sobel Verified Report, Dkt. 209-8, at 12. However, that's not the same as alleging Walston's drive stun shocks—the alleged excessive force—contributed to Penman's death.

The Court addresses the next two *Hudson* factors—the need for the application of force, and the relationship between that need and the amount of force used—together. *See Hudson*, 503 U.S. at 7. Plaintiff alleges that there was "no need for Walston to use the Taser" after Penman was restrained. Resp. to Walston Mot. for Summ. J. at 41. For his part, Walston states the record does not go so far as to show that use of the taser after Penman was restrained. *See* Walston Mot. for Summ. J. at 2–3; *see also* Walston Memorandum, (Walston Mem.), Dkt. 197-1, at 1; Walston Reply at 3. Force is not needed when an inmate is under control and not resisting. *See, e.g.*, *McKinney*, 651 F. App'x at 465. Indeed, the fact that there might have been a need to use force when Penman was unrestrained in his cell does not give Walston a license to use force after that need is gone. Therefore, a genuine dispute about material fact exists, and if Plaintiff's allegations are credited, a reasonable jury could conclude that the amount of force that Walston used was not reasonably related to the need for force. *See id.* Both of these factors weigh in favor of Plaintiff.

The fourth *Hudson* factor is the threat that the officials reasonably perceived. *See Hudson*, 503 U.S. at 7. Here, the parties essentially restate their same arguments from the second and third factors. *See* Walston, et al., Mot. for Summ. J. at 2–3; *see also* Resp. to Walston Mot. for Summ. J. at 41. Both parties agree that Penman was running into his cell door headfirst and punching himself. *See* Walston Mot. for Summ. J.; *see also* Resp. to Walston Mot. for Summ. J. at 11. It is reasonable for the officers to perceive that behavior as threatening. *Cf. McKinney*, 651 F. App'x at 466. However, Plaintiff argues that Walston could not have perceived a threat when Penman was secured in handcuffs and leg restraints or subdued in the restraint chair, with six other officers present. *See* Resp. to Walston Mot. for Summ. J. at 41. Currently it appears from the summary of the evidence that a jury could conclude that whatever

13

threat Walston claims to have perceived was not reasonable.  *See Cordell*, 759 F.3d at 585

(distinguishing a case where an inmate was "unsecured" with a case where an inmate "was

handcuffed and in a submission hold").  A reasonable jury might conclude otherwise, deciding

that Walston was not aware that Penman was restrained or that these shocks were administered

immediately before the restraints were secured.  But this is a genuine dispute of material fact, so

the Court therefore finds that this factor weighs in favor of Plaintiff.

The last *Hudson* factor asks whether Walston took any efforts to temper the severity of a

forceful response.  *See Hudson*, 503 U.S. at 7.  Plaintiff claims that "there is no evidence that

Walston sought to deescalate the situation."  *See* Resp. to Walston Mot. for Summ. J. at 41.

Walston neither analyzes this factor nor provides any evidence to the contrary.  *See* Walston

Mem. at 2–3.  Accordingly, at this stage of the proceedings, this factor weighs in favor of

Plaintiff.  *See Cordell*, 759 F.3d at 583–84 ("[T]here is no evidence in the record that [the

officer] made any effort to moderate the force he used against [the inmate] except his bare

assertion that he 'used the minimum amount of force necessary to control . . . [the inmate].' ").

All five of the *Hudson* factors favor Plaintiff.  Therefore, upon considering the *Hudson*

factors and the parties' factual allegations, the Court finds that a jury would not be unreasonable

in concluding that Walston acted with malicious and sadistic intent to injury Penman.

ii.    *Objective*

Based on the parties' pleadings and evidence, the Court finds that a jury could conclude

that the "pain inflicted by" Walston was "sufficiently serious" to offend "contemporary standards

of decency."  *Cordell*, 759 F.3d at 580 (quoting *Williams*, 631 F.3d at 383).  The record, read in

Plaintiff's favor, reveals that Walston tased Penman three times while he was secured: twice

while he was in handcuffs and leg restraints and once while he was in a restraint chair.  *See* Resp. to Walston Mot. for Summ. J. at 41.

The Sixth Circuit has held that "striking a neutralized suspect who is secured by handcuffs is objectively unreasonable."  *See Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010); *see also see also Burgess v. Fischer*, 735 F.3d 462, 474–75 (6th Cir. 2013) (collecting cases).  And although the Sixth Circuit has found that an officer's use of a taser on an inmate in a restraint chair did not amount to excessive force, that decision turned on the fact that the inmate was repeatedly rocking the chair, attempting to remove himself from the chair, and actually succeeded in removing one of the hand restraints.  *See Anderson v. Strode*, No. 18-6139, 2019 WL 5624508, at *2 (6th Cir. May 17, 2019).  According to Plaintiff, Penman was neutralized and was "no longer resisting" when Walston shocked him.  *See* Resp. to Walston Mot. for Summ. J. at 39.  Walston seems to argue otherwise, claiming that continued use of the taser was necessary because "Penman was essentially impervious" to the shocks.  *See* Walston Mem. at 1; *see also* Walston Mot. for Summ. J. at 2–3.  There is a genuine dispute about whether Penman was resisting at the time that Walston administered the drive stun shocks.  As such, a trier of fact could therefore find that Walston's actions did not comport with human decency.  *See Cordell*, 759 F.3d at 580; *see also Schreiber*, 596 F.3d at 332.

### iii.   *Whether Walston Is Entitled to Qualified Immunity*

Walston argues that he is entitled to qualified immunity.  *See* Walston Mot. for Summ. J. at 2.  The doctrine of qualified immunity "shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." *Judd v. City of Baxter, Tennessee*, 780 F. App'x 345, 347 (6th Cir. 2019) (quoting *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608 (6th Cir. 2015)) (internal quotation

marks omitted).  When considering a qualified immunity claim in the context of a motion for summary judgment in a § 1983 case, the Court must engage in a two-step analysis. *See id.*  First, the Court asks whether "the facts . . . alleged or shown [by the plaintiff] make out a violation of a constitutional right." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)) (internal quotation marks omitted).  If the Court finds that a constitutional right was violated, it next asks whether that right was "clearly established" at the time of the alleged misconduct. *See id.* (citing *Pearson*, 555 U.S. at 232).  For a right to be clearly established, "the right's contours [need to be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *See Cordell*, 759 F.3d at 588 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)).  The burden rests on the plaintiff to show that a clearly established right was violated. *See Judd*, 780 F. App'x at 347 (citation omitted).  At the summary judgment stage, the plaintiff must at least provide sufficient evidence to create a genuine issue of fact with respect to this issue. *See id.* (citation omitted).  On this point, it is important to note that, "where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Id.* at 349 (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004)).

The facts alleged by Plaintiff make out a violation of a constitutional right, *see supra*. And in the Sixth Circuit, the right to be free from excessive force is a clearly established right for purposes of the qualified immunity analysis. *See, e.g.*, *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001) ("[I]f there is a genuine issue of fact as to whether an officer's use of force was objectively reasonable, then there naturally is a genuine issue of fact with respect to whether a reasonable officer would have known such conduct was wrongful.").  And it is clearly established law in the Sixth Circuit that the reasonableness of an officer's use of a taser turns on

16

active resistance.  *See Kent v. Oakland Cty.*, 810 F.3d 384, 392 (6th Cir. 2016) (collecting cases).

Walston maintains that he is entitled to qualified immunity because "[a]t the moment the OC

[pepper] spray was used through to the last use of the taser in drive-stun mode, Penman's

conduct necessitating use of force to try to gain compliance and restrain him were continuing."

Walston Mem. at 3; *see also* Walston Reply at 3.  However, Plaintiff alleges otherwise, stating

that Walston administered drive stun shocks while Penman was restrained and had stopped

resisting.  *See* Resp. to Walston Mot. for Summ. J. at 41.  Any reasonable officer would know

that that the Eighth Amendment prohibits the conduct that Plaintiff accuses Walston of

exhibiting in the particular factual circumstances in which that conduct occurred.  Because of

this factual dispute, the question of qualified immunity is better left for a jury to evaluate.  *See*

*Judd*, 780 F. App'x at 349.

### 2.  *S.H. Sargent*

Plaintiff alleges that S.H. Sargent used excessive force "by continuing to press a stun

shield over [] Penman's body and face, for nearly eight [] minutes, while he was in a restraint

chair, subdued, covered in pepper spray, injured, no longer resisting[,] and in a state of obvious

respiratory distress/no longer breathing."  Resp. to Corley, et al., Mot. for Summ. J. at 43; *see*

*also* Am. Compl. ¶ 63.  To that, S.H. Sargent contends that he used the shield "defensively"—

like a "barrier"— because Penman was "resisting by kicking, spitting, and trying to bite

officers."  Corley, et al., Mot. for Summ. J. at 24. [8]

---

[8] Perhaps out of an abundance of caution, S.H. Sargent also argues that his offensive use of the shield—use of the stun feature and holding the shield over Penman while he was on the ground in his cell—was not excessive force. *See* Corley, et al., Mot. for Summ. J. at 21–24.  However, Plaintiff's response makes clear that the only allegation of excessive force against S.H. Sargent pertains to his use of the shield while Penman was subdued in the restraint chair.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 43.  The Court therefore does not address whether S.H. Sargent's offensive use of the shield constitutes excessive force.

i.   *Subjective*

The Court begins with the subjective component and considers each of the *Hudson* factors.  First up is the extent of Penman's injury.  *See Hudson*, 503 U.S. at 7.  Penman died— that is as severe an injury as possible.  *Cf. McKinney*, 651 F. App'x at 465.  This factor would therefore seem to indicate that S.H. Sargent's conduct meets the subjective component of excessive force.  *See id.* (affirming a district court's decision that "since [the inmate] died, the first *Hudson* factor indicated that the officers met the subjective component of excessive force."). However, S.H. Sargent argues otherwise, because he claims that the defensive use of the shield did not cause Penman's death.  *See* Corley, et al., Mot. for Summ. J. at 28.  Emphasizing that he "did not 'press' the shield down on [] Penman's face," S.H. Sargent states that "[t]here is not . . . any indication, let alone a medical conclusion," that Penman "died of suffocation due to the shield."  *Id.* at 25, 28; *see also* Corley, et al., Reply at 9–10 (stating that S.H. Sargent's "elbows are bent" in the video and that "[i]f S.H. Sargent pushed on that chair, it would have slid across the floor or tipped over").  But this runs contrary to Plaintiff's allegations.  Plaintiff alleges that S.H. Sargent did "press[] the shield down on Penman's face" and that the stun shield further restricted Penman's breathing and thereby contributed to his death.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 5, 20, 24–25, 44; *see also* Am. Compl.¶ 6 ("When Officer Sargent first pressed the shield down on Penman's face, he was gasping for air under the hood, choking on the pepper spray.").  A jury could find that there is evidence in the record to support both parties' positions.  *See* Video #1, Dkt. 181-9; Video #2, Dkt. 181-10.  This type of factual dispute is inappropriate to resolve on a motion for summary judgment, meaning that this first factor weighs in favor of Plaintiff.  *See McKinney*, 651 F. App'x at 465.

The second *Hudson* factor is the need for application of force.  *See Hudson*, 503 U.S. at 7.  S.H. Sargent claims that there was need for force because Penman was "resisting by kicking, spitting, and trying to bite officers" "during the struggle . . . in the cell."  Corley, et al., Mot. for Summ. J. at 24; *see also id.* at 27.  Plaintiff responds that "there was no need, at all, for S.H. Sargent to apply force" after the struggle in the cell.  Resp. to Corley, et al., Mot. for Summ. J. at 44.  That's because, according to Plaintiff, S.H. Sargent pressed the shield over Penman when he was "completely subdued in the restraint chair, with a spit hood on."  *Id.* at 44–45.  If Plaintiff is correct that S.H. Sargent used force when Penman was secured in the restraint chair with a spit hood on, then a jury could conclude that S.H. Sargent's actions were excessive.  *See McKinney*, 651 F. App'x at 465 (affirming a district court's decision that an officer "may not have needed . . . to apply additional force once [the inmate] was secured in the restraint chair") (internal quotations omitted).  The video evidence and the parties' pleadings indicate that a jury could reach such a conclusion.  *See id.*  Accordingly, this factor weighs in favor of Plaintiff.

Third, the Court looks to the relationship between the need for the application of force and the amount of force used.  *See Hudson*, 503 U.S. at 7.  The question here is, in essence, whether S.H. Sargent used more force than was needed.  *See McKinney*, 651 F. App'x at 466.  Here, the parties begin by restating their positions on the need for force: S.H. Sargent claims that force was necessary because Penman had been trying to bite officers and spit on them, while Plaintiff claims that force was unnecessary once Penman had been subdued in the restraint chair.  *See* Corley, et al., Mot. for Summ. J. at 24, 27; *see also* Resp. to Corley, et al., Mot. for Summ. J. at 45.  S.H. Sargent continues by arguing that the amount of force was appropriate because the use of the shield was defensive and intended only to protect the officers and help restrain Penman, not to harm him.  *See* Corley, et al., Mot. for Summ. J. 24–27.  Plaintiff disputes this,

while also emphasizing that the amount of force used was particularly unreasonable because S.H. Sargent did not have to make any split-second decisions.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 45 (citing *Davis v. Agosto*, 89 F. App'x 523, 527 (6th Cir. 2004)).

Undoubtedly, some force was necessary to stop Penman's violent behavior.  *See, e.g.*, *Thomas v. Greene*, No. 99–3179, 1999 WL 1253102, at *1 (6th Cir. Dec. 17, 1999) (officer did not violate the Eighth Amendment when prisoner was "threatening and uncooperative . . . and [the officer] did not use more force than was necessary to cause [the prisoner] to comply with his requests").  But Plaintiff's claim for excessive force against S.H. Sargent is based on force that allegedly occurred when Penman was "no longer resisting" and "no longer breathing."  Resp. to Corley, et al., Mot. for Summ. J. at 43.  A jury could find that force at that point would not be reasonably related to the need of restraining Penman and therefore was excessive force.  *Cf.* *Roberson v. Torres*, No. 09-12927, 2013 WL 979446, at *2 (E.D. Mich. Mar. 13, 2013) (explaining that the amount of force used was not reasonable, in part, because there was "no disturbance at that time involving Plaintiff which involved significant risks to the safety of inmates and prison staff").

The fourth *Hudson* factor is the threat that the officials reasonably perceived.  *See* *Hudson*, 503 U.S. at 7.  Here, the parties essentially restate their same arguments from the second and third factors.  *See* Corley, et al., Mot. for Summ. J. at 24, 27; *see also* Resp. to Corley, et al., Mot. for Summ. J. at 45.  Both parties agree that Penman was running into his cell door headfirst and punching himself.  *See* Corley, et al., Mot. for Summ. J. at 1; *see also* Resp. to Corley, et al., Mot. for Summ. J. at 11.  It is reasonable for the officers to perceive that behavior as threatening.  *Cf. McKinney*, 651 F. App'x at 466.  However, Plaintiff argues that S.H. Sargent could not have perceived a threat when Penman was secured in the restraint chair and

motionless.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 45–46.  The arguments here present somewhat of a closer call than the other factors.  True, Penman might not have been a threat while in the restraint chair.  *See id.*  But S.H. Sargent observed Penman's violent behavior and actively participated in the struggle in Penman's cell.  *See* Corley, et al., Mot. for Summ. J. at 12–13.  Those interactions might have colored S.H. Sargent's perception of Penman in the restraint chair.  Nevertheless, Plaintiff's allegation that Penman was restrained and had stopped resisting (along with the fact that S.H. Sargent was surrounded by six other prison officers), suggest that a jury could conclude that whatever threat S.H. Sargent claims to have perceived was not reasonable.  *See Cordell*, 759 F.3d at 585 (distinguishing a case where an inmate was "unsecured" with a case where an inmate "was handcuffed and in a submission hold").  The Court therefore finds that this factor weighs in favor of Plaintiff.

The fifth and final *Hudson* factor asks whether S.H. Sargent took any efforts to temper the severity of a forceful response.  *See Hudson*, 503 U.S. at 7.  Plaintiff claims that "there is no evidence that S.H. Sargent sought to deescalate the situation."  *See* Resp. to Corley, et al., Mot. for Summ. J. at 46.  S.H. Sargent neither analyzes this factor nor provides any evidence to the contrary.  *See* Corley, et al., Mot. for Summ. J. at 27.  Accordingly, this factor weighs in favor of Plaintiff.  *See Cordell*, 759 F.3d at 583–84 ("[T]here is no evidence in the record that [the officer] made any effort to moderate the force he used against [the inmate] except his bare assertion that he 'used the minimum amount of force necessary to control . . . [the inmate].' ").

All five of the *Hudson* factors favor Plaintiff.  Therefore, upon considering the *Hudson* factors and the parties' factual allegations, the Court concludes that at this stage of the proceedings Plaintiff's excessive force claim against S.H. Sargent satisfies the subjective

component requirement.  A reasonable jury could conclude that S.H. Sargent acted with malicious and sadistic intent to injury Penman.

ii.   *Objective*

Next, the Court evaluates the objective component of Penman's Eighth Amendment claim, asking whether a reasonable jury could conclude that "the pain inflicted" by S.H. Sargent was "sufficiently serious" to offend "contemporary standards of decency."  *Cordell*, 759 F.3d at 580 (quoting *Williams*, 631 F.3d at 383).  S.H. Sargent contends that his use of the shield "falls well short of being sufficiently serious to offend contemporary standards of decency" because "Penman suffered no harm from the shield being held in front of him."  Corley, et al., Mot. for Summ. J. at 26.  Plaintiff argues just the opposite, stating that "[S.H.] Sargent administered 'sufficiently serious' force" by "[p]essing a shield over [Penman's] face for eight [] minutes," which "further limited Penman's ability to breathe and contributed to his death."  Resp. to Corley, et al., Mot. for Summ. J. at 46.  Whether S.H. Sargent's use of the shield was a cause in Penman's death is a trial-worthy dispute better suited for a jury, not one to be determined summarily by the Court.

Furthermore, the record, when viewed in Plaintiff's favor, shows that S.H. Sargent used his shield when Penman was in a restraint chair, subdued, injured, no longer resisting, and no longer breathing.  *See* Resp. to Corley, et al., at 43.  In the Sixth Circuit, "striking a neutralized suspect who is secured by handcuffs is objectively unreasonable."  *See Schreiber*, 596 F.3d at 332; *see also Burgess*, 735 F.3d at 474–75 (collecting cases).  That holding applies with equal— if not greater—force to an inmate secured in a restraint chair.  The Court, at this stage, does not assess credibility or resolve factual disputes.  On Plaintiff's version, a jury could find that S.H. Sargent inflicted serious pain and used force "repugnant to the evolving standards of decency

that mark the progress of a maturing society." *Cordell*, 759 F.3d at 585 (internal quotations omitted).  Plaintiff has therefore set out a viable excessive force claim against S.H. Sargent.

iii.     *Whether S.H. Sargent Is Entitled to Qualified Immunity*

S.H. Sargent argues that he is entitled to qualified immunity.  *See* Corley et al., Mot. for Summ. J. at 30–33.  In determining whether a law enforcement officer is entitled to qualified immunity, the Court asks two questions: (1) whether the officer violated the plaintiff's constitutional rights; and (2) whether that constitutional right was clearly established at the time of the incident.[9]  *See Judd*, 780 F. App'x at 347.  According to S.H. Sargent, "[n]o reasonable officer confronted with the situation that S.H. Sargent was would have thought that merely holding a plexiglass shield between an inmate who has been biting and spitting and his coworkers was unlawful."  Corley, et al., Mot. for Summ. J. at 33.  However, according to Plaintiff, S.H. Sargent didn't just "hold" the shield over Penman—he "pressed" the shield down on Penman—while Penman was neither spitting nor biting.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 20, 24–25, 44.  Because of this factual dispute, the issue of how S.H. Sargent was positioning the shield is better left for a jury.  *See Judd*, 780 F. App'x at 349.

However, to defeat S.H. Sargent's qualified immunity defense, Plaintiff must still show that pressing a shield down on Penman's face and body was sufficiently egregious such that any reasonable officer would realize its unconstitutionality.  In the Sixth Circuit, the right to be free from excessive force is a clearly established right for purposes of the qualified immunity analysis.  *See Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009).  Furthermore, under the Sixth Circuit's case law, "there undoubtedly is a clearly established legal norm

---

[9] For a complete recitation of the qualified immunity legal standard, *see supra* Part III.A.1.iii.  The entire legal standard set out in Part III.A.1.iii also applies here, however, to avoid unnecessary repetition the Court incorporates that language by reference in this footnote.

precluding the use of violent physical force" when someone "already has been subdued and does not present a danger to himself or others." *Id.* (collecting cases). In *Kostrzewa* the Sixth Circuit stated—and district courts in the Sixth Circuit have recently reiterated—that "if there is a genuine issue of fact as to whether an officer's use of force was objectively reasonable, then there naturally is a genuine issue of fact with respect to whether a reasonable officer would have known such conduct was wrongful." 247 F.3d at 641; *Cordell*, 759 F.3d at 588 (similar); *see also Combs v. City of Pontiac*, No. 12-11539, 2014 WL 128206, at *4 (E.D. Mich. Jan. 14, 2014); *Brown v. Shaw*, No. 19-CV-12811, 2021 WL 228897, at *4 (E.D. Mich. Jan. 22, 2021); *Dudas v. Engel*, No. 1:19 CV 2565, 2021 WL 2000579, at *13 (N.D. Ohio May 17, 2021); *Wiley-Stiger v. O'Bannon*, No. 3:14-CV-295-DJH, 2016 WL 7422682, at *7 (W.D. Ky. Dec. 22, 2016); *Ford v. City of Detroit*, No. 2:17-CV-12933-TGB, 2019 WL 6052973, at *6 (E.D. Mich. Nov. 15, 2019); *Edwards v. Matthews*, No. 2:17-CV-236, 2018 WL 3462506, at *10 (S.D. Ohio July 17, 2018); *Lovett v. Barney*, No. 1:15CV024, 2017 WL 694208, at *4 (S.D. Ohio Feb. 22, 2017); *Wiley-Stiger v. O'Bannon*, No. 3:14-CV-295-DJH, 2016 WL 7422682, at *7 (W.D. Ky. Dec. 22, 2016). Under this standard, the Court concludes that any reasonable official would know that pressing a shield down on a prisoner's face for eight minutes while that prisoner is subdued, no longer resisting, and in a state of respiratory distress/no longer breathing is an unreasonable method of maintaining control of a prisoner in a room occupied by at least six other officers. *See Cordell*, 759 F.3d at 588.

In response, S.H. Sargent quotes *Cordell* and states that "[w]hile there may be much sense in stating that it is inappropriate to grant qualified immunity whenever a jury could find that a jail official acted with malicious and sadistic intent," the Sixth Circuit' "frame[s] [inmates'] Eighth Amendment right[s] at a lower level of generality." Corley, et al., Reply at 11

(quoting *Cordell*, 759 F.3d at 588).  However, immediately after that quotation, the *Cordell* court repeated the legal standard set forth in *Kostrzewa*, explaining that "[i]n the past, we have held that 'if there is a genuine issue of fact as to whether an officer's use of force was objectively reasonable, then there naturally is a genuine issue of fact with respect to whether a reasonable jail official would have known such conduct was wrongful.' " *Cordell*, 759 F.3d at 588 (quoting *Kostrzewa*, 247 F.3d at 642).  Then, in the very next sentence, the *Cordell* court held that "[u]nder this standard" any reasonable official would know that ramming a handcuffed and controlled prisoner headfirst into a concrete wall is an unreasonable method of restraint.  *Id.*  Far from rejecting *Kostrzewa*, as S.H. Sargent suggests it does, *Cordell* actually used *Kostrzewa* as part of its reasoning for rejecting a qualified immunity defense.  *See id.*  Therefore, *Cordell's* "lower level of generality" mandate means that, in the qualified immunity context, simply stating that officers cannot maliciously and sadistically inflict harm over-generalizes the right that must be defined and clearly established.  *See id.*  So, crediting Plaintiff's version of events, the Court concludes that Plaintiff has done more than this.  *See Kostrzewa*, 247 F.3d at 641; *Cordell*, 759 F.3d at 588; *Harris*, 583 F.3d at 367.  Granting qualified immunity at this time is inappropriate. *Ibid.*

### B.  Deliberate Indifference

Prison officials violate the Eighth Amendment when they act with "deliberate indifference" to the "serious medical needs" of inmates committed to their charge.  *Bays v. Montmorency Cty.*, 874 F.3d 264, 268 (6th Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)).  A deliberate indifference claim is made up of two components, one subjective and the other objective.  *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

25

The subjective component requires a showing that that an official acted with a sufficiently culpable state of mind.  *See Darrah v. Krisher*, 865 F.3d 361, 368 (6th Cir. 2017) (quoting *Farmer*, 511 U.S. at 834).   This means that, at the summary judgment stage, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).  "Because government officials do not readily admit the subjective component of this test," it may be demonstrated through "inference from circumstantial evidence."  *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)); *see also Finley v. Huss*, 723 F. App'x 294, 298 (6th Cir. 2018).

The objective component requires a plaintiff to prove that "the alleged deprivation of medical care was serious enough to violate the Eighth Amendment."  *Rhinehart*, 894 F.3d at 737 (citing *Farmer*, 511 U.S. at 834).  To meet this standard, a plaintiff must demonstrate that he was experiencing a "sufficiently serious medical need[,]" meaning one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895, 897 (6th Cir. 2004)).  The Sixth Circuit has noted that this inquiry is sometimes a simple one, because "a serious medical condition carries with it a serious medical need."  *Rhinehart*, 894 F.3d at 737.

Plaintiff alleges that Lamb, S.E. Sargent, S.H. Sargent, Corley, Bailey, Harris, Denny, Walston, and Patton "knew that there was a strong likelihood that [] Penman was in danger of serious personal harm," yet these Defendants "repeatedly disregarded the known and obvious

risks to [] Penman's health and safety."  Am. Compl. ¶¶ 68–69.  The Court addresses these allegations as they pertain to each group of Defendants who have filed for summary judgment.

### 1.  *Lamb, S.E. Sargent, S.H. Sargent, Corley, Harris, Denny*

Lamb, S.E. Sargent, S.H. Sargent, Corley, Harris, and Denny have filed a motion for summary judgment, claiming that they are entitled to judgment as a matter of law on Penman's deliberate indifference claim.  *See* Corley, et al., Mot. for Summ. J. at 33–37.  The core of Defendants' argument here is that they were corrections officers, not medical practitioners, and as such they were entitled to rely on the professional clinical judgments of the medical staff.  *See id.*  Plaintiff essentially argues that even though Defendants were medical laypersons, they should have been able to recognize that Penman's life was in serious jeopardy.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 36.

### i.  *Subjective*

Plaintiff alleges deliberate indifference for both physical medical needs and mental health needs.  Plaintiff claims that anyone within earshot of Penman would have heard his wheezing— also known as "stridor"—and recognized that his life was in serious jeopardy.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 36.  Plaintiff's claim, if true, would show that Defendants heard Penman's stridor, must have inferred a substantial risk, and disregarded that risk.  *See Darrah*, 865 F.3d 368.  And under the subjective component, "[a] jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.' " *Rhinehart*, 894 F.3d at 738 (quoting *Farmer*, 511 U.S. at 842).  What Plaintiff alleges is precisely the type of "obvious" risk that should go to a jury.  *Ibid.*  Defendants claim that Penman's stridor was not obvious because they only learned what stridor was during this action.  *See* Corley, et al., Reply at 4.  But not knowing a medical term is different from not knowing that

27

wheezing often indicates trouble breathing.  *Cf. Rhinehart*, 894 F.3d at 738.  And although Defendants emphasize that "Nurse Bauer was on hand" and "could have then referred [] Penman to any medical and/or mental health staff he deemed appropriate," that does not change the alleged obviousness of the risk.  Corley, et al., Mot. for Summ. J. at 26.  What's more, Plaintiff alleges that Defendants "ignore[d] the physical condition of [Penman] for critical minutes while he lay dying, " *Stevens-Rucker v. City of Columbus, OH*, 739 F. App'x 834, 846 (6th Cir. 2018), and failed to provide medical care to Penman, *see Est. of Owensby v. City of Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005).  A reasonable jury could conclude that Defendants heard Penman's wheezing breathing sounds and were deliberately indifferent in not responding.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 36; *see also* Corley, et al., Reply at 4–5.

Plaintiff also asserts that these Defendants were deliberately indifferent to Penman's "mental illness" and "psychosis."  Resp. to Corley, et al., Mot. for Summ. J. at 34.  Here, Plaintiff references when Defendants "first encountered Penman" "in the midst of a psychotic episode, causing harm to himself."  *Id.* at 36.  The Court therefore construes Plaintiff's mental health deliberate indifference allegations as referring solely to the events that occurred on April 25, 2017, not Penman's documented history of mental illness prior to that date.  *See id.*

According to Plaintiff, each of these Defendants observed Penman running headfirst into his cell door and punching himself.  *See* Am. Compl. ¶¶ 35–36; *see also* Resp. to Corley, et al., Mot. for Summ. J. at 33–37.  Plaintiff calls Penman's behavior a "clear indication of a mental health problem."  Am. Compl. ¶ 31.  To support this position, Plaintiff cites the deposition testimony of Doctor Sobel, a board-certified emergency medicine physician.  *See* Sobel Dep., Dkt. 209-12; *see also* Corley, et al., Resp. at 6 n.2.  Doctor Sobel states that Penman's behavior "is the most conspicuously obvious example" that he has "ever seen in forty years of somebody

repeatedly trying to inflict self-harm." Sobel Dep. at 3. Sobel therefore concludes that "any layperson[]" would understand that Penman was in "a manic state" of "delirium" and that "you'd have to be a fool not to . . . conclu[de]" that Penman was attempting suicide. *Id.* Despite this, Plaintiff asserts that "no mental health or medical personnel were notified of Penman's behavior." Am. Compl. ¶ 31; *see also id.* ¶¶ 31–36.

However, Defendants claim that they were not deliberately indifferent to Penman's mental health needs because "the first task of medical or mental health treatment in response to a man beating his head and body against a door and punching himself in the face is to stop him from doing so." Corley, et al., Mot. for Summ. J. at 36. Plaintiff does not respond to this argument, instead focusing only on the Defendants' behavior that occurred after the cell extraction had begun. *See* Resp. to Corley, et al., Mot. for Summ. J. at 34–40. Nevertheless, Plaintiff's actions leading up to the cell team entering the cell and all events that occurred during the extraction from the cell to the placement of Penman in the restraint chair at least provide context to the subsequent alleged actions of the Defendants.

In the Sixth Circuit, these allegations are sufficient, at this stage of the proceedings, to find that Penman has established the subjective component of his deliberate indifference claim against these Defendants.

ii.   *Objective*

Defendants do not dispute that Penman's stridor satisfies the objective requirement of Penman's deliberate indifference claim. *See* Corley, et al., Mot. for Summ. J. at 33–37. Indeed, the Sixth Circuit has explained that symptoms associated with asphyxia—"wheezing" and "difficulty breathing"—"are quite obvious and recognizable even to a lay person." *Harrison*, 539 F.3d at 519. As such, Sixth Circuit case law makes clear that a jury could find that

Penman's physical medical needs were sufficiently serious. *Cf. Estate of Carter v. City of Detroit*, 408 F.3d 305, 311–12 (6th Cir. 2005) (finding that the plaintiff's medical need was "sufficiently serious" because he was "exhibiting the classic signs of an impending heart attack"). Furthermore, the parties both state that Penman suffered from bipolar and antisocial personality disorders. *See* Corley, et al., at 4; *see also* Resp. to Corley, et al., at 2. And regardless of whether or not Penman was being treated for those disorders,[10] those diagnoses, coupled with Penman's behavior on the day in question, demonstrate that a jury could find that on April 25, 2017, Penman was suffering from sufficiently serious mental health needs. *See Harrison*, 539 F.3d at 518. As such, Plaintiff has satisfied the requisite objective component of the deliberate indifference claim.

       iii.     *Whether Lamb, S.E. Sargent, S.H. Sargent, Corley, Harris, and Denny Are Entitled to Qualified Immunity*

In determining whether a law enforcement officer is entitled to qualified immunity, the Court asks two questions: (1) whether the officer violated the plaintiff's constitutional rights; and (2) whether that constitutional right was clearly established at the time of the incident.[11] *See Judd*, 780 F. App'x at 347. In raising a qualified immunity defense, these Defendants only state that they are entitled to qualified immunity on this claim because "they were not deliberately indifferent" and "they are entitled to rely on the judgment of medical and/or mental health professionals." Corley, et al., Mot. for Summ. J. at 47. However, these Defendants admit that

---

[10] Patton claims that, according to Tonya Gray, Bipolar 1 "was in [Penman's] history" but that "[i]t wasn't a mental health disorder that he was being treated for." Patton Mot. for Summ. J. at 19 (citing Gray Dep., Dkt. 186-9, at 1). This fact somewhat cuts against Plaintiff's position that Penman's mental health disorders were objectively sufficiently serious. *See Harrison*, 539 F.3d at 518. However, the Court notes that just because an inmate is not receiving treatment does not mean that the disorder does not mandate treatment. *See id.* Indeed, Patton goes on to admit that "Penman displayed behavior indicating a serious mental healthcare need on April 25, 2017." Patton Mot. for Summ. J. at 20.

[11] For a complete recitation of the qualified immunity legal standard, *see supra* Part III.A.1.iii. The entire legal standard set out in Part III.A.1.iii also applies here, however, to avoid unnecessary repetition, the Court incorporates that language by reference in this footnote.

"[t]he right to medical care is clearly established" and that "it is beyond dispute that [] Penman was in obvious need of medical and/or mental health care on the day of his death."  Corley, et al., Reply at 3.  Indeed, in the Sixth Circuit, it is "clearly established that officers must provide prompt aid to an unbreathing detainee." *Kulpa for Est. of Kulpa v. Cantea*, 708 F. App'x 846, 855 (6th Cir. 2017).  Furthermore, "[a]s early as 1972, [the Sixth Circuit] stated that 'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.' " *Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 477 (6th Cir. 2021) (citing *Est. of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005)).  Likewise, the Sixth Circuit "reiterated in 2013 that '[i]t is clearly established that a prisoner has a right not to have his known, serious medical needs disregarded by . . . a medical provider or [an] officer.' " *Greene v. Crawford Cty., Michigan*, 22 F.4th 593, 615 (6th Cir. 2022) (quoting *Burwell*, 7 F.4th at 477).

Because there is a genuine issue of material fact as to whether the Defendant officers observed Penman unable to breath and responded with the requisite care, these Defendants are not entitled to summary judgment on the basis of qualified immunity.

### 2. *Walston*

Walston has filed a motion for summary judgment, claiming that "he was not privy to much of the information regarding Penman's medical and mental health" and therefore the record "fails to establish that Walston's attitude and conduct toward Penman's situation was indifferent."  Walston Mem. 7.  Plaintiff disagrees, arguing that "there is overwhelming evidence of Walston's deliberate indifference," which "caused [] Penman's death."  Resp. to Walston Mot. for Summ. J. at 35.

i.  *Subjective*

Plaintiff alleges deliberate indifference for both physical medical needs and mental health needs.  The Court has already concluded that Plaintiff has satisfied the requisite subjective component of the deliberate indifference claim against Lamb, S.E. Sargent, S.H. Sargent, Corley, Harris, and Denny, *see supra* Part III.B.1.i.  That rationale applies with equal force to Walston.  *See* Walston Mot. for Summ. J. at 7–8; *see also* Resp. to Walston Mot. for Summ. J. at 31–35.  There are, however, two details specific to Walston that merit discussion.  First, Walston emphasizes facts that occurred prior to the incident on April 25, 2017, such as his ignorance about Penman's medical history, attempts to speak with Penman on April 24, 2017, and observations earlier in the day on April 25, 2017.  *See* Walston Mem.  However, as discussed *supra* Part III.B.1.i, Plaintiff's claim here does not include those prior events.  Second, Walston claims that restraint had not been fully completed and he did not observe Penman's inability to breath.  *See* Walston Reply at 1.  But because Plaintiff argues otherwise, and a jury could find that there is evidence in the record to support both positions, this is a genuine dispute of material fact.

Just as with the other officers, the Court finds that, at this stage of the proceedings, Plaintiff has established the subjective component of the deliberate indifference claim against Walston.

ii.  *Objective*

The Court has already concluded that Plaintiff has satisfied the requisite objective component of the deliberate indifference claim against Lamb, S.E. Sargent, S.H. Sargent, Corley, Harris, and Denny, *see supra* Part III.B.1.ii.  For those same reasons, the Court concludes that

Plaintiff has met the objective component of the deliberate indifference claim against Walston. *See* Walston Mot. for Summ. J. at 7–8; *see also* Resp. to Walston Mot. for Summ. J. at 31.

### iii.     *Whether Walston Is Entitled to Qualified Immunity*

In determining whether a law enforcement officer is entitled to qualified immunity, the Court asks two questions: (1) whether the officer violated the plaintiff's constitutional rights; and (2) whether that constitutional right was clearly established at the time of the incident.[12]  *See Judd*, 780 F. App'x at 347.  In raising a qualified immunity defense, Walston argues that "the record is insufficient to overcome [his] qualified immunity relative to Plaintiff's deliberate indifference claims."  Walston Mot. for Summ. J. at 8.  Here, Walston frames the events as "sudden, unexpected, and unforeseen."  *Id.*  However, Plaintiff's version of the facts is quite different.  According to Plaintiff, S.H. Sargent used excessive force "by continuing to press a stun shield over [] Penman's body and face, for nearly eight [] minutes, while he was in a restraint chair, subdued, covered in pepper spray, injured, no longer resisting[,] and in a state of obvious respiratory distress/no longer breathing."  Resp. to Corley, et al., Mot. for Summ. J. at 43; *see also* Am. Compl. ¶ 63; Resp. to Walston Mot. for Summ. J. at 34.  Plaintiff also alleges that anyone within earshot of Penman, including Walston, would have heard Penman's wheezing—also known as "stridor"—and recognized that Penman's life was in serious jeopardy. *See* Resp. to Walston Mot. for Summ. J. at 33.  When considered against the legal landscape described *supra* Part III.B.1.iii, this factual dispute means that Walston is not entitled to summary judgment on his qualified immunity defense.

---

[12] For a complete recitation of the qualified immunity legal standard, *see supra* Part III.A.1.iii.  The entire legal standard set out in Part III.A.1.iii also applies here, however, to avoid unnecessary repetition, the Court incorporates that language by reference in this footnote.

### 3.   *Patton*

Patton has filed a motion for summary judgment, claiming that Plaintiff has not set out a valid deliberate indifference claim against him.  *See* Patton Mot. for Summ. J. at 17–25.  Plaintiff responds that there is "substantial evidence that Patton violated Penman's right to be free from deliberate indifference to a serious medical need."  Resp. to Patton Mot. for Summ. J. at 37.

### i.   *Subjective*

Plaintiff alleges deliberate indifference for both physical medical needs and mental health needs.  The Court has already concluded that Plaintiff has satisfied the requisite subjective component of the deliberate indifference claim against Lamb, S.E. Sargent, S.H. Sargent, Corley, Harris, and Denny, *see supra* Part III.B.1.i.  That rationale applies with equal force to Patton. *See* Patton Mot. for Summ. J. at 20–25; *see also* Resp. to Patton Mot. for Summ. J. at 32–37. There are, however, four details specific to Patton that merit discussion.

First, Patton asserts that upon seeing Penman's self-harming behavior, Patton told Penman that he would be placed in the restraint chair if he did not stop.  *See* Patton Mot. for Summ. J. at 20; *see also* Patton Reply at 4–6.  And according to Patton, he decided to initiate a cell entry team when Penman's behavior subsequently became more violent.  *See* Patton Mot. for Summ. J. at 21.  However, while these allegations indicate that Patton might not have disregarded the risk to Penman, they do not prove it, *see supra* Part III.B.1.i.  A reasonable jury could still conclude, even with this information, that Patton disregarded the risk to Penman.

Second, Patton claims that he called the prison medical department for additional medical assistance after Penman became unresponsive and notified the prison's call center that an ambulance was needed.  *See* Patton Mot. for Summ. J. at 23.  However, Plaintiff claims that Patton was deliberately indifferent *before* those calls were made.  *See* Resp. to Patton Mot. for

Summ. J. at 32–37.  The fact that Patton might have stopped acting deliberately indifferent toward Penman does necessarily absolve Patton for prior deliberate indifference.

Third, Patton maintains that there is no evidence in the record to support Plaintiff's claim that Patton asked for a cell extraction team that he knew was untrained and incompetent.  *See* Patton Reply at 6–7.  In fact, Patton claims that he did not have any role in selecting the members of the cell entry team.  *See id.*  In that same vein, Patton asserts that he did not directly see the cell entry.  *See id.* at 7.  All of that may be true, but even Patton admits that this does not relate to whether Patton viewed Penman in significant physical distress.  *See id.*  And because Plaintiff's deliberate indifference claim pertains to the officers' conduct when Penman was in the restraint chair, these arguments do not merit summary judgment in favor of Patton.

Fourth, Patton claims that the video evidence shows that Patton was not in a position to have closely observed or heard Penman.  *See id.* at 8–10.  Here Patton states that he was "on the periphery" of the cell entry team's actions, left the room at two different times, and was distracted by the loud coughing of the officers due to the presence of the pepper spray.  *See id.* at 9–10.  Plaintiff alleges just the opposite, however, stating that Patton "observ[ed]" and "witness[ed]" Penman "audibly, and visibly, gasping for air."  Resp. to Patton Mot. for Summ. J. at 34.  A jury could find that there is evidence in the record to support both parties' claims, so granting summary judgment based on these arguments would be inappropriate.

Just as with the other officers, the Court finds that, at this stage of the proceedings, Plaintiff has established the subjective component of the mental health needs deliberate indifference claim against Patton.

ii.    *Objective*

The Court has already concluded that Plaintiff has satisfied the requisite objective component of the deliberate indifference claim against Lamb, S.E. Sargent, S.H. Sargent, Corley, Harris, and Denny, *see supra* Part III.B.1.ii.  For those same reasons, the Court concludes that Plaintiff has met the objective component of the deliberate indifference claim against Patton. *See* Patton Mot. for Summ. J. at 17–20; *see also* Resp. to Patton Mot. for Summ. J. at 31–32. The Court does note, however, Patton's argument that "[t]he record does not show . . . that [] Penman suffered from a medical or mental health condition sufficiently serious . . . prior to the incident on April 25, 2017." *Id.* at 20; *see also* Patton Reply at 3–4.  Here, the Court reiterates that, for the purposes of the deliberate indifference claim against Patton, Plaintiff only alleges that Penman's experiencing a sufficiently serious medical need on April 25, 2017.  *See* Resp. to Patton Mot. for Summ. J. at 31–32.  Here, Patton also emphasizes the "reasonable actions" that he took on April 25, 2017, such as telling Penman to stop his self-harming behavior or else he would be placed in the restraint chair.  Patton Reply at 4.  However, these arguments go towards the subjective analysis—these facts suggest that Patton might not have disregarded the risk—not the objective analysis.

iii.    *Whether Patton Is Entitled to Qualified Immunity*

In determining whether a law enforcement officer is entitled to qualified immunity, the Court asks two questions: (1) whether the officer violated the plaintiff's constitutional rights; and (2) whether that constitutional right was clearly established at the time of the incident.[13]  *See Judd*, 780 F. App'x at 347.  In raising a qualified immunity defense, Patton argues that "[t]here is

---

[13] For a complete recitation of the qualified immunity legal standard, *see supra* Part III.A.1.iii.  The entire legal standard set out in Part III.A.1.iii also applies here, however, to avoid unnecessary repetition, the Court incorporates that language by reference in this footnote.

no evidence in the record to show that [] Patton violated Penman's clearly established constitutional rights."  Patton Mot. for Summ. J. at 29; *see also* Patton Reply at 18–19.  Here, Patton repeats facts from his deliberate indifference subjective analysis while also reciting much of the same facts and legal standards that the other Defendant officers do.  *See id.* at 26–30.  So, for the same reasons set out *supra* Part III.B.1.iii, Part III.B.2.iii and Part III.B.3.i, Patton is not entitled to summary judgment on his qualified immunity defense for this claim.

### C.  Failure to Intervene

A police officer who fails to act to prevent the use of excessive force may still be held liable where "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."  *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Plaintiff alleges that Lamb, S.E. Sargent, S.H. Sargent, Corley, Bailey, Harris, Denny, Walston, and Patton "stood by without intervening to protect [] Penman and prevent the repeated violations of Penman's constitutional rights, even though they had the duty and opportunity to do so."  Am. Compl. ¶ 73.  Specifically, Plaintiff maintains that Defendants failed to intervene when S.H. Sargent pressed the shield over Penman's face and when Bailey used a chokehold.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 48.  The Court addresses each of these allegations as they pertain to each group of Defendants.

### 1.  *Lamb, S.E. Sargent, S.H. Sargent, Corley, Harris, Denny*

Lamb, S.E. Sargent, S.H. Sargent, Corley, Harris, and Denny have filed a motion for summary judgment, claiming that they are entitled to judgment as a matter of law on Penman's failure to intervene claim.  *See* Corley, et al., Mot. for Summ. J. at 37–47.

Defendants first argue that Plaintiff's failure to intervene claim must be dismissed because there was no excessive force with regard to S.H. Sargent's use of the shield.  *See* Corley, et al., Mot. for Summ. J. at 38–39; *see also* Corley, et al., Reply at 13.  However, as discussed *supra* Part III.B.2, Plaintiff has set out a valid excessive force claim against S.H. Sargent.  As such, Defendants' argument here does not merit summary judgment.

Defendants next argue that the officers' verbal commands, show of force, pepper spray, and taser were ineffective at restraining Penman.  *See* Corley, et al., Mot. for Summ. J. at 39–43. Defendants therefore conclude that "the team had to physically restrain [] Penman."  *Id.* at 43. However, Plaintiff's claim here pertains solely to Defendant's failure to intervene with respect to S.H. Sargent's placement of the shield over Penman's face and Bailey's use of a chokehold.  *See* Resp. to Corley, et al., Mot. for Summ. J. at 48.  So the fact that Defendants say they had to physically restrain Penman does not respond to Plaintiff's complaint about how Penman was restrained.

Turning to the two elements set out in *Turner v. Scott*, Defendants next argue that none of them "perceived that Bailey was doing anything that impeded [] Penman's breathing."  Corley, et al., Mot. for Summ. J. at 45.  Defendants claim here that they never observed the alleged excessive force, and as a result, they did not have the opportunity or means to prevent the harm from occurring.  *See id.*; *see also Turner*, 119 F.3d at 429.  However, Plaintiff citing to the video evidence, maintains that "each of the Defendant Officers had to have seen Officer Bailey using a chokehold on [] Penman."  Resp. to Corley, et al., Mot. for Summ. J. at 48.  Because there is evidence in the record that could support Plaintiff's position, this is a genuine dispute of material fact that is inappropriate to resolve on summary judgment.  *See id.*

Finally, without citing case law, Defendants contend that Plaintiff should not be permitted to proceed with the failure to intervene claim based on Bailey's chokehold because Plaintiff did not plead that claim. *See* Corley, et al., Reply at 2–3. According to these Defendants, Plaintiff limited the failure to intervene claim to the alleged violations of constitutional rights listed in the Amended Complaint, and the only constitutional violations described in the Amended Complaint are the excessive force claims (against Walston and S.H. Sargent) and the deliberate indifference claims. *See id.* at 2 (citing Am. Compl. ¶ 73). Defendants are correct that to succeed on a claim for failure to intervene, a plaintiff must show that there was an "underlying constitutional violation." *Greene*, 22 F.4th at 615 (quoting *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 413 (6th Cir. 2015)). However, Plaintiff has alleged facts pertaining to Bailey that would support an underlying constitutional violation, and "the plaintiff is the master of the complaint and may proceed on its preferred cause of action." *Hamilton Cty. Emer. Commc'ns Dist. v. BellSouth Telecomm. LLC,* 852 F.3d 521, 532 (6th Cir. 2017). Importantly, too, Defendants originally must have thought that Plaintiff's failure to intervene allegations included Bailey's chokehold, because they addressed this issue in their motion for summary judgment. *See* Corley, et al., Mot. for Summ. J. at 45. Therefore, the Court declines to dismiss Plaintiff's failure to intervene claim on this basis. *See Jenkins v. Louisville-Jefferson Cty. Metro Gov't*, No. 3:17-CV-00151-RGJ, 2019 WL 1048850, at *4 (W.D. Ky. Mar. 5, 2019) (refusing to dismiss a failure to intervene claim on the basis that plaintiff "failed to plead the requisite underlying constitutional violation").

Defendants also claim that they are entitled to qualified immunity for failure to intervene regarding Walston's and S.H. Sargent's actions. *See* Corley, et al., Mot. for Summ. J. at 46–47; *see also* Corley, et al., Reply at 13. However, the same reasons for not granting Defendants

qualified immunity on the excessive force and deliberate indifference claims also apply to the failure intervene claim.

### 2. *Walston*

Like Lamb, S.E. Sargent, S.H. Sargent, Corley, Harris, and Denny, Walston argues that he is entitled to summary judgment because he "neither observed nor had reason or opportunity to make observations of an alleged misuse of the shield." Walston Mot. for Summ. J. at 4. Similarly, Walston claims that he "never observed any hold on Penman's neck." *Id.* at 5; *see also* Walston Reply at 2 ("Walston did not see" Bailey using a chokehold because his "back was effectively turned as his attention was drawn elsewhere."). However, just as with the other officers, *supra* Part III.C.1, Plaintiff alleges that Walston "witnessed [S.H.] Sargent place the shield over Penman's face" and "had to have seen Officer Bailey using a chokehold on [] Penman." Resp. to Walston Mot. for Summ. J. at 40–41. Because a jury could find that there is evidence in the record to support Plaintiff's position, this is a genuine dispute of material fact that is inappropriate to resolve on summary judgment. *See id.*

Walston also argues that he "observed nothing telling him that the shield was being used excessively" because S.H. Sargent's "[u]se of the shield was [standard operating procedure]." Walston Mot. for Summ. J. at 5. Plaintiff disputes this, citing a report from Doctor Schwartz, who has over thirty years' experience in criminal justice management. *See* Resp. to Walston Mot. for Summ. J. at 15 n.4. Referring to S.H. Sargent's use of the shield, Doctor Schwartz says that there was nothing standard about S.H. Sargent's use of the shield, explaining that he "ha[s] worked with literally hundreds of jails and prisons across the United States and Canada and [he] [has] never before seen a shield used in that manner on an inmate in a restraint chair." *Id.* at 24 (citing Schwartz Report, Dkt. 209-14, at 17). Therefore, to the extent that prison policy on use of

the shield might have affected Walston's ability to know that excessive force was being used, that issue is better left for a jury.

Walston also claims that he is entitled to qualified immunity for the failure to intervene claim. *See* Walston Mem. at 4–5. However, the same reasons for not granting Walston qualified immunity on the excessive force and deliberate indifference claims also apply to the failure intervene claim.

### 3. *Patton*

Like Lamb, S.E. Sargent, S.H. Sargent, Corley, Harris, and Denny, Patton argues that he is entitled to summary judgment because "[t]here is no evidence in the record to show that [] Patton observed or had reason to know that others were violating [] Penman's constitutional rights." Patton Mot. for Summ. J. at 25. However, just as with the other officers, *supra* Part III.C.1, Plaintiff alleges that Patton "observed Penman in obvious respiratory distress, and later, in a motionless state without respiration." Resp. to Patton Mot. for Summ. J. at 40. Because there is evidence in the record that could support Plaintiff's position, this is a genuine dispute of material fact that is inappropriate to resolve on summary judgment. *See id.*

Also like the other officers, Patton claims that S.H. Sargent simply "held" the shield near Penman and "did not apply pressure to Penman with the shield." Patton Reply at 14. Patton therefore maintains that "the placement of the shield in front of Penman did not cause or contribute to his death." *Id.* at 15. Plaintiff disputes both of these claims, however, and there is evidence in the record that could support both parties' positions. As such, granting summary judgment on this basis would be improper.

It does not matter that Patton might not have been present for the entire use of force against Penman. *See* Patton Mot. for Summ. J. at 26; *see also* Patton Reply at 15. Patton alleges

that he "le[ft] at one point to answer a phone call" and "le[ft] again to retrieve a pitcher of water."  Patton Mot. for Summ. J. at 26; *see also* Patton Reply at 15.  However, even if Patton did leave, Plaintiff still alleges that Patton failed to intervene while he was in the room.  *See* Resp. to Patton Mot. for Summ. J. at 40.  And an officer cannot get rid of his duty to intervene simply by walking out of the room.  *See Turner*, 119 F.3d at 429.

Similarly, Patton argues that any intervention would "have been unsafe" because "Patton viewed nothing during the cell entry team's action that warranted his intervention."  Patton Mot. for Summ. J. at 26.  However, thinking that something is unwarranted does not necessarily make it dangerous.  Again, Patton's arguments fall short of requiring summary judgment.

Patton also claims that he is entitled to qualified immunity for the failure to intervene claim.  *See* Patton Mot. for Summ. J. at 26–30.  However, the same reasons for not granting Patton qualified immunity on the deliberate indifference claim also apply to the failure intervene claim.

### D. Supervisory Liability

Supervisory liability under § 1983 requires "more than an attenuated connection between the injury and the supervisor's alleged wrongful conduct."  *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (citing *Phillips v. Roane Cty.*, 534 F.3d 531, 544 (6th Cir. 2008)); *see also Graves v. Malone*, 810 F. App'x 414, 420 (6th Cir. 2020).  Instead, "supervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor."  *Peatross*, 818 F.3d at 241 (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)).  That means that the failure to supervise is only actionable if "the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it."  *Id.* at 242 (citing *Shehee v. Luttrell*, 199 F. 3d 295, 300 (6th Cir. 1999)).  The Sixth Circuit has "interpreted

this standard to mean that 'at a minimum,' the plaintiff must show that the defendant 'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.' " *Id.* (quoting *Shehee*, 199 F.3d at 300).  As part of this inquiry, courts also consider "whether there is a causal connection between the defendant's wrongful conduct and the violation alleged." *Id.* (citing *Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002)). "These principles make clear that a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor." *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006).

Plaintiff alleges that White, Coleman, Crews, and Walston "knew . . . that [certain] policies, practices, and/or customs posed substantial risks to the health and safety of inmates like [] Penman," yet they "failed to take reasonable steps to alleviate those risks."  Am. Compl. ¶ 79. Plaintiff also states that "[i]n addition to the named subordinate Defendants in this case, Plaintiff further asserts that another subordinate of Defendants, [] Gray, violated [] Penman's Eighth Amendment right to be free from deliberate indifference to a serious medical or mental health need."  Resp. to Coleman, et al., at 33.  The Court addresses each of these allegations as they pertain to each Defendant.

### 1. *White*

White first argues that, because a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor, and Plaintiff has failed to provide evidence that Gray was a subordinate of White, summary judgment is appropriate for the supervisory claim pertaining to Gray's conduct.  *See* Coleman, et al., Reply at 4.  Here, White states that he had no authority to supervise the healthcare decisions of medical or mental

healthcare personnel and therefore had no authority to supervise Gray's clinical decisions.  *See id.*

Plaintiff has not provided any evidence that Gray believed White to be someone who supervised her work at KSP.  *See Pfiefer v. Hiland*, No. 5:15-CV-7-TBR, 2019 WL 1772421, at *6 (W.D. Ky. Apr. 22, 2019).  Nor has Plaintiff provided evidence that White issued rules which Gray felt that she had to follow or risk suffering employment related consequences.  *See id.*  To the contrary, White states that he "had no authority to supervise [] Gray's clinical decisions." Coleman, et al., Reply at 4 (citing White Aff., Dkt. 222-1).  Because supervisory liability is applicable only when plaintiff has established unconstitutional conduct on behalf of the subordinate, and here Plaintiff has not met that burden, the Court grants summary judgment in favor of White's motion for summary judgment as to the supervisory liability claim relating to Gray.[14]

With regard to the Defendant Officers' conduct, White has filed a motion for summary judgment arguing that there is no evidence that he encouraged, directly participated in, or implicitly authorized, approved, or knowingly acquiesced in the officers' alleged misconduct. *See* Coleman, et al., Mot. for Summ. J. at 19.  To start with, White emphasizes that he had never met Penman, was not aware of Penman's physical or mental health issues prior to April 25, 2017, and did not observe or participate in the acts of the cell entry team.  *See id.*  White also states that once he received the medical examiner's report and the autopsy report, he "took action to terminate [] Bailey and [] Walston" because until that point he did not have "sufficient evidence to support the discipline of a merit employee."  *Id.* at 20–21.

---

[14] Because this prerequisite of supervisory liability has not been established, the Court need not address whether Gray's conduct gives rise to a constitutional violation.

Plaintiff responds that there is sufficient evidence of White's supervisory liability for both failure to train and failure to supervise.  For the failure to train component, Plaintiff alleges that White failed to properly train KSP officers.  *See id.*  However, a general failure to train claim is not a means to impose liability on a supervisor in his individual capacity.  *See Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 845 (E.D. Tenn. 2011).  Indeed, "[a]bsent personal involvement in the underlying unconstitutional act, the attempt to hold municipal supervisors liable in their individual capacities for their alleged failure to adequately train employees improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Id.* at 846.  Therefore, there are generally two ways of imposing supervisory liability on a failure to train claim: (1) a pattern of conduct; or (2) a truly egregious single incident.  *See id.* (citing *Ontha v. Rutherford Cnty.*, 222 F. App'x 498, 504–05 (6th Cir. 2007).  Plaintiff claims that the record has established a pattern of conduct sufficient for the supervisory claim against White to survive summary judgment.

Here, Plaintiff cites the deaths of inmates McStoots, Embry, and Warfield, each of which Plaintiff claims demonstrate White's failure to train.  *See* Resp. to Coleman, et al., Mot. for Summ. J.  White responds that none of these other inmates' deaths put him on notice of the unconstitutional conduct alleged by Plaintiff.  *See* Coleman, et al., Reply at 11–13.  According to White, not only did those other inmates die from different types of causes, but there is also no evidence to show that White knew about the details of each of these deaths.  *See id.*  Therefore, according to White, Plaintiff's supervisory liability claim for failure to train must be dismissed. *See id.*

The Court agrees with White.  Plaintiff only presents evidence that White knew about Embry's death.[15]  *See* Resp. to Coleman, et al., Mot. for Summ. J.  And Embry died after he starved himself to death over a period of forty-five days.  *See* Resp. to Coleman, et al., Mot. for Summ. J. at 31.  Therefore, Plaintiff does not allege that use of force contributed to Embry's death.  *See id.* at 31.  By contrast, Plaintiff's failure to train claim in this case pertains to cell extractions, use of the restraint chair, use of the stun shield, and pepper spray decontamination. *See id.* at 37.  So, Plaintiff falls short of demonstrating that a reasonable jury could find White liable in his individual capacity based on a pattern of conduct.  The Court therefore grants summary judgment with regard to Plaintiff's supervisory liability claim as it relates to White's alleged failure to train.

For the failure to supervise component of Plaintiff's supervisory liability claim, Plaintiff alleges that there is sufficient evidence to conclude that White encouraged, directly participated in, or implicitly authorized, approved, or knowingly acquiesced in the officers' alleged misconduct.  *See* Resp. to Coleman, et al., Mot. for Summ. J. at 39–42.  Plaintiff alleges that, like the plaintiff in *Peatross*, White failed to properly hire, train, and supervise subordinates, which contributed to the alleged unconstitutional conduct.  *See id.*; *see also Peatross*, 818 F.3d at 233. Plaintiff further alleges that White might have been responsible for the enforcement of these policies and customs, and attempted to cover-up the unconstitutional conduct of his subordinates. Specifically, Plaintiff describes how after Penman's death, the Kentucky State Police released statements to the press suggesting that Penman died as a result of "self-inflicted" trauma.  *Id.* at

---

[15] White maintains, and Plaintiff does not say otherwise, that "[t]here is no evidence to show that [he] knew about the details of McStoots's death" because McStoots "was housed at Kentucky State Reformatory, and [] White was not a Warden of that Institution."  Coleman, et al., Reply at 12.  Similarly, White asserts that "Warfield's death occurred at KSP before [] White was the Warden at KSP."  *Id.* at 13.  And on top of that, Warfield allegedly died of a misdiagnosis, not use of force.  *See id.*

22.  Plaintiff also asserts that KDOC did not conduct any critical incident review in connection with Penman's death, contrary to policy, and that White never requested a critical incident review.  *See id.* at 23.

True, evidence of a cover-up would satisfy Plaintiff's burden at this stage of the proceedings.  *See Peatross*, 818 F.3d at 243 (cover-up tends to show supervisory liability); *Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 542 (6th Cir. 2015) (same); *Powell v. Fugate*, 364 F. Supp. 3d 709, 727 (E.D. Ky. 2019) (same).  However, the evidence does not show that White tried to cover-up Penman's death.  White states that "the KDOC Commissioner or Deputy Commissioner," not the Warden, "orders the performance of a critical incident review." Coleman, et al., Reply at 10.  Plaintiff has not shown otherwise.  Nor has Plaintiff demonstrated that White was involved in providing the press with knowingly false statements about Penman's death.  *See* Resp. to Coleman, et al., Mot. for Summ. J.  Without this evidence of a cover-up, the Court is left only with Plaintiff's general allegation of failure to properly hire and supervise. Therefore, viewing all of the facts in the light most favorable to Plaintiff, a reasonable jury could not conclude that White—in his individual capacity—played more than a passive role in the Defendant Officers' alleged underlying constitutional violations.  Therefore, White is entitled to summary judgment on the supervisory liability claim.[16]

### 2.  *Crews*

Crews first argues that, because a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor, and Plaintiff has failed to provide

---

[16] White also argues that he is entitled to summary judgment on Plaintiff's supervisory liability claim due to qualified immunity.  *See* Coleman, et al., Mot. for Summ. J. at 15–19.  White argues this is the case because there is no evidence that he implicitly authorized, approved, or knowingly acquiesced in the alleged unconstitutional conduct of the officers.  *See id.* at 19.  However, because the Court has already found that White is entitled to summary judgment on the supervisory liability claim, the issue of qualified immunity need not be answered in this opinion.

evidence that Gray or the Defendant officers were subordinates of Crews, summary judgment is appropriate for the supervisory claim.  *See* Coleman, et al., Reply at 4.  Here, Crews states that she was not a supervisor for employees at KSP or employees of CCS, including Gray.  *See id.* Crews further asserts that "there is simply no evidence that Crews or Coleman had any supervisory responsibility for the 'Defendant officers,' including [] Patton."  *Id.* at 5.

Plaintiff has not provided any evidence that either Gray or the Defendant Officers believed Crews to be someone who supervised their work at KSP.  *See Pfiefer*, 2019 WL 1772421, at *6.  Nor has Plaintiff provided evidence that Crews issued rules which Gray or the Defendant Officers felt that they had to follow or risk suffering employment related consequences.  *See id.*  To the contrary, Crews states that she "was not an Appointing Authority for KDOC employees working at Kentucky State Penitentiary," "had no authority to hire, fire, or discipline employees working at the Kentucky State Penitentiary," and "had no authority to hire, fire, or discipline employees working for CCS."  Crews Aff., Dkt. 191-8, ¶ 3.

Because supervisory liability is applicable only when plaintiff has established unconstitutional conduct on behalf of the subordinate, and here Plaintiff has not met that burden, the Court grants summary judgment in favor of Crews' motion for summary judgment as to the supervisory liability claim.[17]

### 3.  *Coleman*

Coleman first argues that, because a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor, and Plaintiff has failed to provide evidence that Gray or the Defendant officers were subordinates of Coleman, summary judgment

---

[17] Because this prerequisite of supervisory liability has not been established, the Court need not address other questions relevant to the supervisory liability claim against Crews, i.e., whether Gray's conduct gives rise to a constitutional violation and whether Crews is entitled to qualified immunity.

is appropriate for the supervisory claim.  *See* Coleman, et al., Reply at 4.  Here, Coleman states

that on January 1, 2017, (four months prior to Penman's death), Coleman became the Director of

the Critical Incident Stress Debriefing Team, a position in which she did not supervise Gray or

the Defendant Officers.  *See id.*

 Just as with Crews, Plaintiff has not provided any evidence that either Gray or the

Defendant Officers believed Coleman to be someone who supervised their work at KSP.  *See*

*Pfiefer*, 2019 WL 1772421, at *6.  Nor has Plaintiff provided evidence that Coleman issued rules

which Gray or the Defendant Officers felt that they had to follow or risk suffering employment

related consequences.  *See id.*  To the contrary, Coleman states that she "was not an Appointing

Authority," "had no authority to hire, fire, or discipline KDOC staff," and "had no authority to

hire, fire, or discipline employees of Correctional Care Solutions (CCS) or other KDOC staff."

Coleman Aff., Dkt. 191-9, ¶ 3.

 Because supervisory liability is applicable only when plaintiff has established

unconstitutional conduct on behalf of the subordinate, and here Plaintiff has not met that burden,

the Court grants summary judgment in favor of Coleman's motion for summary judgment as to

the supervisory liability claim.[18]

### 4. *Walston*

 Walston argues that the record fails to establish a supervisory liability claim because

"[t]he mere fact that Walston was the supervisor of the entry team, alone, or the mere fact that he

was an active participant on the team cannot be used to establish his individual liability under

this theory."  Walston Mot. for Summ. J. at 6.  In support of this argument, Walston claims that

---

[18] Because this prerequisite of supervisory liability has not been established, the Court need not address other questions relevant to the supervisory liability claim against Coleman, i.e., whether Gray's conduct gives rise to a constitutional violation and whether Crews is entitled to qualified immunity.

"the record does not establish that [he] selected the [cell entry] team members."  Walston Reply

at 2.  Here, Walston relies upon *Burke v. Thompson*, No. 5:15-CV-00007-TBR, 2016 WL

2587212 (W.D. Ky. May 4, 2016).  *See id.*  *Burke* states that "[a]bsent personal involvement in

the underlying unconstitutional act, the attempt to hold municipal supervisors liable in their

individual capacities for their alleged failure to adequately train employees improperly conflates

a § 1983 claim of individual supervisory liability with one of municipal liability."  2016 WL

2587212, at *8 (quoting *Dillingham*, 809 F. Supp. 2d at 846).  The proposition of *Burke* traces

back to the Sixth Circuit's decision in *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531 (6th Cir.

2008).

 *Phillips* arose after an inmate died from untreated diabetes.  *See id.* at 536.  In that case,

correctional officers found the inmate unconscious in her cell and revived her.  *See id.*  And

although the inmate was swollen, had "purplish" skin, and vomited blood, the officers declined

to provide her with medical treatment.  *See id.* at 536.  Instead, a contract doctor examined her

for six minutes and prescribed Ibuprofen for knee pain.  *See id.*  Two weeks later, that inmate

was found dead in her cell.  Id. at 536–37.  The inmate's estate filed claims against, among

others, the mayor, sheriff, and administrative director of ambulance services in their individual

capacities for failing to supervise the correctional officers.  *See id.* at 537.  The Sixth Circuit in

*Phillips* found that these "general allegations" were "more appropriately submitted as evidence

to support a failure-to-train theory against the municipality itself, and not the supervisors in their

individual capacities," because the estate had not "point[ed] to a specific action of each

individual supervisor."  *Id.* at 543–44.

 In this case, Plaintiff alleges that Walston—unlike the mayor, sheriff, and administrative

director in *Phillips*—was "personal[ly] involve[d]" and "directly participate[]" in the alleged

misconduct, both as a participant and as a supervisor. *Burke*, 2016 WL 2587212, *8; *Peatross*, 818 F.3d at 242; *see also* Resp. to Walston Mot. for Summ. J. at 39.  What's more, Plaintiff asserts that as the leader of the cell entry team, Walston "encouraged the specific incident of misconduct." *Peatross*, 818 F.3d at 242; *see also* Resp. to Walston Mot. for Summ. J. at 39. Because a reasonable juror could agree with Plaintiff, Walston's arguments do not merit summary judgment.

Walston also claims that he is entitled to qualified immunity for the failure to intervene claim. *See* Walston Mem. at 5–6.  However, the same reasons for not granting Walston qualified immunity on the excessive force and deliberate indifference claims also apply to the failure intervene claim.

### E.  Negligence/Wrongful Death

"Whenever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent . . . caused it." Ky. Rev. Stat. Ann. § 411.130(1).  A wrongful-death claim "is, at its core, a tort claim based upon negligence." *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016).  Thus, to state a plausible wrongful-death claim, a plaintiff must allege "(1) a legally cognizable duty, (2) a breach of that duty, (3) causation linking the breach to an injury, and (4) damages." *Id.* (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003)).  In the context of the operation of a jail, "[t]he law imposes the duty on a jailer to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody, but he cannot be charged with negligence in failing to prevent what he could not reasonably anticipate." *Rowan County v. Sloas*, 201 S.W.3d 469, 479 (Ky. 2006).

Plaintiff alleges that "all Defendants were negligent and grossly negligent in their treatment of [] Penman" and that "the medical professionals responsible for [] Penman's care failed to meet the standard of care applicable to their professions." Am. Compl. ¶ 94. The Court addresses each of these allegations as they pertain to each group of Defendants that have filed for summary judgment.

### 1. *Lamb, S.E. Sargent, S.H. Sargent, Corley, Harris, Denny*

These Defendants make two arguments as to why summary judgment is appropriate for Plaintiff's negligence claim. *See* Corley, et al., Mot. for Summ. J. at 47–49; *see also* Corley, et al., Reply at 13–14. First, the Defendants argue that Plaintiff's negligence claim—specifically the use of the words "Defendants" and "treatment"—is improperly conclusory and lacks specificity. *See* Corley, et al., Mot. for Summ. J. at 47–48. With regard to the use of the word "Defendants," Plaintiff specifies that this claim pertains to "all Defendants." Am. Compl. ¶ 94. That is specific enough to survive a motion for summary judgment. And it is permissible to bring a negligence claim against multiple Defendants because there may be more than one proximate cause for the same injury. Similarly, with regard to the use of the word "treatment," Plaintiff's allegations are not void of sufficient specificity. Plaintiff's Amended Complaint and responses provide far more detailed allegations than the "unadorned, the-defendant-harmed-me allegations" which the Supreme Court expressed concern about in *Ashcroft v. Iqbal*. 556 U.S. 662, 678 (2009).

Second, the Defendants argue that it was not foreseeable that S.H. Sargent's action of holding the shield could pose any risk that could cause or even contribute to Penman's death. *See* Corley, et al., Mot. for Summ. J. at 49; *see also* Corley, et al., Reply at 14. To support this argument, the Defendants cite the autopsy and investigation performed by the Western Kentucky

Regional Medical Examiner's Office, which concludes that the shield was not a contributing cause to Penman's death. *See* Corley, et al., Mot. for Summ. J. at 49. That may be so. But Plaintiff has generated a genuine factual dispute about foreseeability. Plaintiff alleges that the stun shield further restricted Penman's breathing and thereby contributed to his death. *See* Resp. to Corley, et al., Mot. for Summ. J. at 20, 24–25, 44. A jury could find that there is evidence in the record to support Plaintiff's position. *See* Video #1, Dkt. 181-9; Video #2, Dkt. 181-10; *see also* Sobel Report at 7 ("The stun shield limited the flow of air and obviously prevented adequate medical evaluation."); Sobel Report at 16 ("[S]tun shielding confined [Penman's] breathing space further."). It is possible that a reasonable jury could conclude that the use of the stun shield was a foreseeable contributing cause to Penman's death. As such, granting summary judgment on these grounds would be inappropriate.

### 2. *Patton*

In the response, Plaintiff does not address the state law negligence claims asserted against Patton. *See* Resp. to Patton Mot. for Summ. J. at 41. Rather, Plaintiff states that "Plaintiff does not intend to pursue a State law claim against Patton. As such, the issue is moot." *See id.* at 41 n.9. The Court therefore does not address this claim as it pertains to Patton.

### 3. *White, Crews, and Coleman*

These Defendants make two arguments as to why summary judgment is appropriate for Plaintiff's negligence claim. *See* Coleman, et al., Mot. for Summ. J. at 27–33. However, these arguments need not be addressed because Plaintiff has since stated that "Plaintiff does not intend to bring State law negligence claims against White, Crews, and Coleman. Thus, that issue is moot." Resp. to Coleman, et al., at 43 n.6.

### 4.  *Walston*

Walston moves for summary judgment for the same reasons that Lamb and the other Defendant Officers.  *See* Walston Mot. for Summ. J. at 1.  According to Walston, "there is insufficient evidence of record establishing that Walston breached a duty owed by him to Penman that was the cause-in-fact or proximate cause of injury and/or death."  *Id.*  For the same reason that the Court rejects the arguments of the other officers, *see supra* Part III.E.1, it rejects those same arguments of Walston.

However, Walston also argues that he is entitled to qualified immunity under Kentucky law.  *See* Walston Mem. at 8.  Walston fails to develop this argument in either his motion for summary judgment or his reply.  *See* Walston Mem. at 8; *see also* Walston Reply.  Walston only provides the Court with a one-sentence argument that cites two cases, neither of which contain so much as a parenthetical explanation or a pincite.  *See* Walston Mot. for Summ. J. at 11.  The Court finds this argument to be insufficient.  *See Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 774 (E.D. Mich. 2010).

## IV.    CONCLUSION

Accordingly, it is **ORDERED** that the Corley, et al., Mot. for Summ. J., Dkt. 181, is **DENIED**; the Patton Mot. for Summ. J., Dkt. 186, is **DENIED**; the Coleman, et al., Mot. for Summ. J., Dkt. 191, **GRANTED**; and the Walston Mot. for Summ. J., Dkt. 197, is **DENIED**.

The Clerk of Court is **DIRECTED TO TERMINATE** Randy White, Cookie Crews, and Deborah Coleman because all claims against them have been dismissed.

**IT IS SO ORDERED**

*Thomas B. Russell*

**Thomas B. Russell, Senior Judge**
**United States District Court**

March 7, 2022